**FUNAI ELECTRIC COMPANY, LTD., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Zenith Electronics Corporation, Defendant–Intervenor.**

**Court No. 87–4–00621.**

United States Court of International Trade.

May 15, 1989.

Siegel, Mandell & Davidson, P.C. (Brian S. Goldstein and Judith M. Barzilay, New York City, of counsel), for plaintiff.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Elizabeth Seastrum, Atty., Commercial Litigation Branch, and John D. McInerney, Atty.-Advisor U.S. Dept. of Commerce, Intern. Trade Admin., Washington, D.C., for defendant.

Frederick L. Ikenson, P.C. (Frederick L. Ikenson and J. Eric Nissley, Washington, D.C., of counsel), for defendant-intervenor.

WATSON, Judge:

This action raises three issues with respect to the determinations made by the Department of Commerce ("Commerce") concerning a model 335–T combination television receiving set and video cassette recorder made by Funai Electric Co., Ltd. ("Funai"). The determinations were contained in the final results of an administrative review entitled *Television Receivers, Monochrome and Color, From Japan,* 52 Fed.Reg. 8940 (1987).

Funai attacks the determination by Commerce to include this particular model within the scope of the dumping finding for television receiving sets and also contests the use of constructed value, rather than third country sales, as the basis for determining the foreign market value of this model. Finally, both Funai and defendant-intervenor, Zenith Electronics Corporation ("Zenith"), for different reasons, disagree with Commerce's determination to make adjustments to the constructed value of this model for differences in circumstances of sale.

The model in question contains a color television, which is to say, it contains a unit capable of receiving a television broadcast signal and displaying the color audio/visual material contained in that signal on a television screen. It also contains a video cassette recorder, or "VCR," which can record television programs from the aforesaid signals on to the medium of video tape, and play back those tapes or video tape cas-

settes which have been commercially recorded or filmed with a video camera recorder ("Camcorder"). In sum, this model is a combination television and VCR. A similar model named the 335–Pro was excluded by Commerce from the scope of T.D. 71–76, 36 F.R. 4597 (1971).[1] The status of the 335–Pro is not controlling in this case because, unlike the model at issue, it is a combination of a color *monitor* and a VCR. A monitor does not have an integral tuner and therefore cannot receive a broadcast television signal. Commerce therefore did not consider the 335 Pro to fall within the scope of television *receivers.*

On the question of whether this model should be included within the scope of the dumping finding, Funai argues that combination units were previously excluded by Commerce, that ordinary Customs classification would support such an exclusion, and that the evidence it submitted as to the cost of the VCR component indicates that treatment of the unit as a television by the Commerce Department was unsupported by substantial evidence.

After reviewing the record and the arguments of the parties, the Court finds no error in the decision of Commerce not to exclude this model. While Commerce has in the past excluded certain combination units from the scope of the television dumping finding, it has always done so on a case-by-case analysis of each situation. It has never issued a generic exclusion for combination units. In addition, such rulings as were made regarding combination units in T.D. 71–76 did not state a comprehensive standard for evaluating the question of exclusion and were all done prior to the decision in *Diversified Products Corp. v. United States,* 6 CIT 155, 572 F.Supp. 883 (1983), a decision which thoroughly analyzed and established the criteria to be used in such cases.

---

1. T.D. 71–76 was the formal finding by the Secretary of the Treasury that television receiving sets, both monochrome and color, from Japan, were being, or were likely to be, sold at less than fair value within the meaning of the Antidumping Act of 1921, as amended. In that publication, the Secretary of the Treasury effectuated an amendment of the Customs Regulations adding television receiving sets, monochrome and color, from Japan, to the list of findings of dumping in effect.

In that decision, Senior Judge Maletz, after first finding that speedometers for exercise machines were within the contemplation of a dumping finding covering "bicycle speedometers," went on to consider whether a double-gear hub drive speedometer, which had not been developed at the time of the 1972 dumping investigation, was properly included within the class of merchandise encompassed by the dumping finding. In affirming the ITA's inclusion of the merchandise within the class or kind covered by the dumping finding, the Court considered the following criteria of commonality between the merchandise: the general physical characteristics of the merchandise; the expectations of the ultimate purchaser; the channels of trade in which the merchandise moved; the ultimate uses of the merchandise, and the cost of the merchandise.

The Court finds that the dominant factors set out in the *Diversified Products* decision were applied to this model by Commerce and were properly applied. In physical terms the television portion of the importation is prominent. The separate use of the unit as a television is indisputable. It is expected to be used as a television by the purchasers, and it moves through the same trade channels as conventional televisions. Even if we were to assume that the video cassette recorder portion of this model is more costly than the television portion, this would not be decisive. The decision as to whether a combination model comes within the scope of a finding for a conventional model cannot be a matter of the relative costs of the segments entering into the combination. If this were so, the technique of combining a putatively dumped article with a more costly related article could become a significant method of evading the result of antidumping investigations. In terms of the logic of the Diversified Product decision, the cost criteria is not applicable where comparison is made between a single product and a similar product which has been incorporated in a combination article. The functional and marketing factors continue to maintain the distinctness and similarity of the television

receiver portion of the 335–T to the original merchandise under investigation.

The record supports the conclusion that this model has an independent television function, is imported for use as a television, and can be so used independently of the video cassette recorder aspect, caters in significant part to the direct television-viewing expectations of the purchasers, and moves in the normal trade channels in which televisions move. The Court therefore finds that this determination was supported by substantial evidence.

■ As a second ground for challenging the Commerce determination with respect to this model, Funai argues that Commerce should have used sales to a third country as the basis for foreign market value, rather than constructed value. However, in view of the undisputed fact that Funai did not supply evidence showing that the price listed in the invoice and bill of lading was actually paid by the customer in the third country, it was entirely reasonable for Commerce to consider this a lack of substantiation of those sales. Commerce's investigative discretion on the matter of supporting documentation was clearly exercised in the proper manner here. *See, Ceramica Regiomontana v. United States,* 10 CIT 399, 636 F.Supp. 961 (1986); *Agrexco, Agricultural Export Co., Ltd. v. United States,* 9 CIT 40, 604 F.Supp. 1238, 1244 (1985).

■ The most interesting dispute in this case involved the question of whether Commerce was correct, once it had based foreign market value on constructed value, to adjust that value upward by adding Funai's patent, royalty and technical services expenses in the United States to that value as a circumstances-of-sale adjustment. This, of course, had the effect of widening the margin of dumping. The argument against that adjustment produced a curious alliance. Defendant-intervenor Zenith argued that Commerce has no authority whatsoever to use the circumstances of sale adjustment provided for in 19 U.S.C.

§ 1677b(a)(4)[2] when the basis of foreign market value is constructed value. Funai makes the more limited argument that Commerce should not have added the U.S. expenses to constructed value because they were already "included" in the category of home market general expenses under 19 U.S.C. § 1677b(e)(1)(B)(i),[3] pursuant to which Commerce added 10% to the cost of production.

Zenith argues that when constructed value is used to arrive at a fair market value it should not be subject to further adjustment, because it was not the intention of Congress to give Commerce the authority to make such adjustments. Zenith argues that in using constructed value there is no logic to making adjustments for differences in circumstances of sale because there are no real sales and that very fact is the reason for replacing actual foreign prices with an analytical construct based purely on costs of production.

There may indeed be something troubling about the abstract logic of this procedure but this does not seem to be as weighty as the considerations which exist on the other side. Zenith's position is at odds with the decision in *Timken Corp. v. United States*, 11 CIT ——, 673 F.Supp. 495, 506–09 (1987) in which this Court held that Commerce may adjust constructed value for the ESP offset, a factor which has been granted the status of a difference in circumstances of sale. The Court found support for its conclusion in legislative awareness of prior administrative practice and in the overriding necessity of avoiding absurd results. *Timken Corp. v. United States*, 11 CIT ——, 673 F.Supp. 495 (1987). Zenith argues that *Timken* was wrongly decided and requests that it not be followed. Discussion of Zenith's argument requires us to enter into the history of the antidumping law. In the Trade Agreements Act of 1979, the definition of "foreign market value," one of the major elements in the calculation of whether dumping margins exist, was changed to include constructed value, a method of determining value based on the costs of production when value cannot be determined from actual sales. 19 U.S.C. § 1677b(a)(2).[4] Formerly, under the Antidumping Act of 1921, constructed value occupied a separate statutory section which did not have its own provision for adjustments due to differences in circumstances of sales. Zenith now revives the argument, made by the

2. 19 U.S.C. § 1677b(a)(4):

In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value (or that the fact that the United States price is the same as the foreign market value) is wholly or partly due to—

\* \* \* \* \* \*

(B) other differences in circumstances of sale ...

\* \* \* \* \* \*

then due allowance shall be made therefore.

3. 19 U.S.C. § 1677b

(e) Constructed value.
(1) Determination. For the purposes of this subtitle, the constructed value of imported merchandise shall be the sum of—
(A) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise under consideration which would ordinarily permit the production of that particular merchandise in the ordinary course of business;
(B) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise under consideration which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, except that—
(i) the amount for general expenses shall not be less than 10 percent of the cost as defined in subparagraph (A), and
(ii) the amount for profit shall not be less than 8 percent of the sum of such general expenses and cost; and

\* \* \* \* \* \*

4. 19 U.S.C. § 1677b(a):

\* \* \* \* \* \*

(2) Use of constructed value. If the administering authority determines that the foreign market value of imported merchandise cannot be determined under paragraph (1)(A), then, notwithstanding paragraph (1)(B), the foreign market value of the merchandise may be the constructed value of that merchandise, as determined under subsection (e) of this section.

plaintiff in *Timken*, that Congress did not intend to allow adjustments to foreign market value when that foreign market value was constructed value, because that would be a major change in the law, flying in the face of Congress' explicit statement that the inclusion of constructed value in the foreign market value section was "not substantive and is intended solely to simplify the law." S.Rep. No. 249, 96th Cong. 1st Sess. 95, *Reprinted in* 1979 U.S.Code Cong. & Ad.News 381, 481.

In *Timken* the court found reason to think that even prior to the 1979 Act, constructed value might have been subject to adjustments. According to *Timken* that finding could explain why Congress said that it was not doing anything substantive but merely simplifying the law when it moved constructed value into the foreign market value section. Zenith does some very precise tracing and analysis of the relevant regulations which were in effect prior to the 1979 Act and by doing so, casts some doubt on the conclusion in *Timken* that constructed value was already being adjusted prior to the 1979 Act. However, for the court in *Timken*, the factor which dictated a conclusion that adjustment to constructed value is proper, was not so much that it represented a continuation of prior administrative procedure and a precise Congressional awareness of such, but the fact that to forbid adjustments would bring about results which appear to be entirely absurd and unfair. This is the main ground upon which this decision relies to find that the adjustment of constructed value for circumstances of sale is done in accordance with the law.

The absurdity noted in the *Timken* opinion was that a bar to adjustment of constructed value would, in cases where there was a low constructed value in the foreign market and a high United States purchase price (which included a large element of direct selling expenses uniquely associated with United States sales), prevent Commerce from doing something which might reveal that the overall foreign market value is higher than the United States purchase price and that a dumping margin exists. *See Timken Co. v. United States*

at 508, Note 20. The existence of such a striking potential for avoidance of the law's purpose and for impedance of the exercise of reasonable investigative thoroughness, is a compelling consideration. If the Court has to choose between the possibility that Congress blithely perpetuated such absurdities and the possibility that it accomplished something fortuitously correct when it moved constructed value into the heart of the definition of fair market value, and thereby made it subject to adjustments, the Court must choose the latter alternative. In any event, even if constructed value had not been directly transplanted into a category in which the authority for adjustments had already been established, the Court would be hard-pressed to say that the adjustment of constructed value would be barred in these circumstances. The palpable incompleteness and imbalance of investigative results reached without such authority would be justification enough.

Funai's final argument against the adjustment which Commerce made to constructed value is that this particular constructed value *already* contained an amount representing the factors sought to be adjusted for, and therefore, the adjustments were duplicative and excessive. Funai argues that when Commerce determined constructed value using the statutory minimum 10% for *home market* general expenses under the authority of 19 U.S.C. § 1677b(e)(1)(B)(i), it could not go on and add in additional expenses such as the patent royalty and technical service expenses added in this case. After following *Timken* and finding that Commerce does have the authority to adjust constructed value the logic of this argument is not acceptable to the Court. The 10% attributed to home market general expenses is a statutorily authorized monolithic amount which represents the minimum amount of general expenses in the absence of, or unsatisfactory evidence of, general expenses in the home market. Since Funai did not sell any of these models in the home market, there was no evidence of the actual general expenses that could be included within the statutory minimum of 10%.

This 10% cannot be broken down into various categories of general expenses such as direct selling expenses, indirect selling expenses, and general non-selling expenses, let alone specifics such as patent fees, royalty fees, and technical service expenses. This being the case, in the absence of any specific evidence that these expenses were incorporated within the statutory minimum of 10%, it was within Commerce's discretion to adjust the constructed value of this model by adding Funai's patent, royalty and technical service expenses in order to avoid unrealistic or absurd results.

For the reasons given above, the Court rejects the arguments made against the determinations of Commerce and finds that those determinations were in accordance with the law and supported by substantial evidence.

Accordingly, it is hereby ORDERED that plaintiff's motion for judgment on the agency record is denied and it is further

ORDERED that the determinations which were disputed in this action and which arose from the administrative review by the U.S. Department of Commerce, entitled *Final* Results of Antidumping Duty Administrative Review of Television Receivers, Monochrome and Color, from Japan, 52 Fed.Reg. 8940 (March 20, 1987) are sustained.