**ZENITH ELECTRONICS CORPORATION,**
Plaintiff,

v.

**UNITED STATES, Defendant,**

and

**AOC International, et al., Defendants–Intervenors.**

Court No. 87–01–00039.

United States Court of International Trade.

July 29, 1991.

Frederick L. Ikenson, P.C. (Frederick L. Ikenson, J. Eric Nissley and Larry Hampel, of counsel), Washington, D.C., for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, U.S. Dept. of Justice, Jeanne Davidson, Atty., and Leila J. Afzal, Attorney–Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, D.C., for defendant.

Willkie Farr & Gallagher (Christopher A. Dunn, William J. Clinton and Zygmunt Jablonski, of counsel), Washington, D.C., for defendants-intervenors.

Grunfeld, Desiderio, Lebowitz & Silverman (Bruce M. Mitchell, of counsel), New York City, for defendant-intervenor Capetronic (BSR) Ltd.

## MEMORANDUM OPINION AND ORDER

WATSON, Senior Judge:

In this action, plaintiff Zenith Electronics Corporation ("Zenith") challenges the final results of the first administrative review of the antidumping order covering colored television receivers ("CTVs") from Taiwan. 51 Fed.Reg. 46,895 (December 29, 1986). In that review the International Trade Administration ("ITA") of the Department of Commerce ("Commerce") found the following dumping margins for the first review period:

| Respondent | Weighted Average Margin |
|---|---|
| AOC International, Inc. | 1.38% |
| Capetronic (BSR) Ltd. | .46% |
| Fulet Electronic Industrial Co. | 2.09% |
| Nettek Corp. | |
| RCA Taiwan, Ltd. | 5.24% |
| Sampo Corp. | 10.14% |
| Shinlee Corp. | 10.14% |
| Shin–Shirasuna Electric Corp. | .56% |
| Tatung Co. | 4.01% |

The administrative review was conducted for the purpose of determining the antidumping duties for the period under review and for establishing cash deposit rates for subsequent entries. Prior to this review, the importation of CTVs from Taiwan had been subject to a final affirmative less than fair value determination made on March 1, 1984. 49 Fed.Reg. 7623 (March 1, 1984). In that final determination, Commerce had found the following dumping margins:

| Respondent | Weighted Average Margin |
|---|---|
| AOC International, Inc. | 3.50% |
| Fulet Electronic Industrial Co. | 23.77% |
| Hitachi Television (Taiwan) Inc. | 26.00% |
| Orion Electric (Taiwan) Co. | .01% |
| RCA Taiwan, Ltd. | 2.89% |
| Sampo Corp. | 23.77% |
| Sanyo | 4.66% |
| Tatung Co. | 8.10% |
| All Others | 5.46% |

The review determination applies to nine Taiwanese manufacturers/exporters of CTVs; AOC International, Inc. ("AOC"); Capetronic (BSR) Ltd. ("Capetronic"); Fulet Electronic Industrial Co., Ltd. ("Fulet"); Nettek Corp. ("Nettek"); RCA Taiwan, Ltd. ("RCA"); Sampo Corp. ("Sampo"); Shinlee Corp. ("Shinlee"); Shin–Shirasuna Electric Corp. ("Shirasuna"); and Tatung Co. ("Tatung"). These companies are referred to collectively as the Taiwanese or the Respondents. AOC, Capetronic, Fulet, Nettek, Sampo, and Tatung appear herein as defendant-intervenors.

Zenith challenges nine aspects of the review determination. They can be briefly described as the tax adjustment, the treatment of antidumping-related legal expenses, the application of a cap to duty assessment rates, the calculation of duty deposit rates, the use of a per se *de minimis* rule for certain small dumping margin amounts, the adjustment of constructed value for differences in circumstances of sale, the treatment of home market expenses for exports, the drawback adjustment, and the existence *vel non* of a fictitious market in the case of certain CTV sales.

Zenith also asserts the existence of three errors in data manipulation; first, that Commerce calculated an erroneous constructed value for Capetronic; second, that Commerce failed to remove certain selling expenses from Shirasuna's United States price ("USP"); and, third, that Commerce failed to match certain United States sales by AOC and Tatung with the proper comparison home market sales.

Commerce concedes the last of the three data errors alleged by Zenith and requests a remand for its correction. As will be discussed in its proper place, Commerce also requests a remand for one aspect of the *de minimis* issue. In all other respects, Commerce defends its review determination as being in accordance with the law and based on substantial evidence in the record. The Court now turns to the resolution of these issues.

■ The first issue raised by Zenith is that Commerce erred in the way that it accounted for the fact that the Taiwanese Commodity Tax was forgiven on exported CTVs. Commerce subtracted the amount of the forgiven commodity tax from foreign market value ("FMV"). In *Zenith Elecs. Corp. v. United States*, 10 C.I.T. 268, 633 F.Supp. 1382 (1986), *appeal dismissed*, 875 F.2d 291 (Fed.Cir.1989) this Court held that § 772(d)(1)(C) of the Tariff

Act of 1930 as amended, 19 U.S.C. § 1677a(d)(1)(C), requires Commerce to account for forgiven tax on exported merchandise by making an upward adjustment to United States Price ("USP") in the amount actually forgiven on the exports. This Court has ruled that the statutory language requires Commerce to calculate the adjustment for forgiven taxes as an addition to USP in the amount of tax forgiven on exports, and to measure the extent to which tax was actually passed through to home market purchasers so that only the forgiveness of that amount of tax can enter into the calculations.

The tax involved here is a 20 per cent commodity tax imposed by Taiwan on all CTVs, but then forgiven on exportation. The Court sees no difference between the Taiwanese Commodity Tax and the taxes previously found subject to this requirement. The Court has continued to adhere to this interpretation of the law, most recently in *Daewoo Elecs. Co. v. United States*, — C.I.T. —, 712 F.Supp. 931 (1989).

The Court also notes that the only proper use of circumstances of sale adjustment in this situation would be for those circumstances of sale which do not flow from the existence of an originally determined dumping price as set out in *Daewoo*. This issue is remanded to Commerce with directions to determine the amount of tax passed through to home market purchasers and to add that amount to USP.

■ Zenith next argues that, by virtue of 19 U.S.C. § 1677a(e)(2), Commerce should have deducted from USP those legal expenses which were related to the antidumping proceedings and which were paid during the period under review. Zenith claims that this falls within the law's requirement that Commerce deduct from Exporter's Sale Price, ("ESP"), all generally incurred expenses by or for the account of the exporter in the United States. In *Daewoo Elecs. Co. v. United States*, — C.I.T. —, 712 F.Supp. 931 (1989), the Court agreed with Commerce that legal fees incurred in connection with antidumping proceedings should not be considered as sell-

ing expenses within the meaning of the law. Zenith's argument has a superficial plausibility but it would offend important considerations of fairness in these matters. A party's cost of protecting its rights in legal proceedings should themselves become a factor in whether or not a party is engaged in dumping. To hold otherwise would resemble the situation in which a party appears only to challenge the jurisdiction of a court and has that appearance used against it as an indicia that the jurisdiction of the court is proper in the case.

This is not really a question of whether or not the legal expenses can be related to the time period of the importation of the merchandise under review. Nor does it relate to the question of whether or not the legal expenses have a tendency to ultimately aid the sale of the merchandise in the United States, which they well may have. Nor is the deciding point the fact that these legal expenses alone in some cases could create dumping where no preexisting dumping exists, although that would certainly be a palpable unfairness. Relying on the latter rationale might lead to reasoning that in those cases ultimately found to have preexisting dumping it might be proper to subsequently account for dumping related legal expenses. The fundamental reason for not allowing the use of legal expenses which are related to antidumping proceedings is that the expenses of a party's participation in legal proceedings provided by law should not become an element in the decision of those selfsame proceedings. On this point, Commerce's position is affirmed. The Court continues to approve the view that such legal expenses should not be deducted from U.S. Price.

■ Zenith has raised a complex question with respect to the assessment of duty on entries of Taiwanese CTVs which were made before the issuance of the final antidumping duty order. In the normal course of events, deposits of estimated antidumping duty are required for the periods between Commerce's preliminary less than fair value determination and its final determination of less than fair value and again between the final determination and the

issuance of an antidumping duty order. These are provisional payments of duties. The question before the Court is to what extent, if any, Commerce is required to assess final duties in excess of the provisional rates which were in effect in the interim periods.

With respect to entries made in the interim period Commerce takes the position that it does not have the authority to assess duties above and beyond the provisional rate in effect between the preliminary less than fair value determination and the final determination. It therefore imposes a cap on the assessment of antidumping duties on entries that occurred between the preliminary less than fair value determination and the issuance of the final antidumping duty order. That cap limits the payment of duties on entries in the interim periods to the provisional rates in effect during the particular interim periods. Zenith insists that practice violates the statutory language and argues that the only interim duties that are protected from being increased are those that were made in the form of a cash deposit. This indeed is the literal language of § 737(a) of the Tariff Act of 1930, as amended, which states as follows:

> (a) Deposited Estimated Antidumping Duty Under Section 733(a)(2).—If the amount of a *cash deposit* collected as security for an estimated antidumping duty under section 733(d)(2) is different from the amount of the antidumping duty determined under an antidumping order issued under section 736, then the difference for entries of merchandise entered, or withdrawn from warehouse, for consumption before *notice of the affirmative determination of the Commission under section 735(b) is published* shall be—
>
> (1) disregarded, to the extent that the *cash deposit* collected is lower than the duty under the order, or
>
> (2) refunded to the extent that *cash deposit* is higher than the duty under the order. [emphasis supplied]

According to Zenith, this provision does not protect those entries for which deposits were made in the form of bond or other security. Commerce argues that the omission of the words "bond, or other security" from § 737(a) was an oversight in legislative drafting and that differences between such other forms of security and the ultimate duty under § 736 may also be "disregarded." It further argues that the result sought by Zenith would contradict the legislative intent, would be inconsistent with other portions of the statute, and would produce an absurd or irrational result. None of this is as simple or as clear as the government would have it.

There is nothing inherently absurd or irrational about making a distinction between cash deposits and deposits made in the form of bonds or other security. A cash deposit requirement can be more burdensome to an importer than the posting of a bond. It is therefore conceivable that in certain instances Congress might have chosen to protect the provisional duty payments only for those who made those payments in the more onerous fashion. The logical question of why this was done with respect to antidumping duties and not with respect to countervailing duties turns out to be connected to the multi-lateral agreements which this legislation was intended to implement and will shortly be discussed. For the moment it is sufficient to say that there is no inherent irrationality in distinguishing between cash deposits and other forms of security.

Congress was aware that cash deposits could unfairly burden an importer during the interim period and therefore specifically empowered Commerce to accept the posting of a bond or other security as an alternative to a cash deposit during that period. 19 U.S.C. § 1673b(d)(2). *See* H.R.Rep. No. 317, 96th Cong., 1st Sess. 62 (1979). Commerce points to that empowerment as a sign of congressional intention that bonds should be the preferred security for provisional duty and as an indication that the absence of mention of bonds in the provision under dispute is a sign that it does not represent the true legislative intention. However, the Court's close study of the statute and the legislative history do not make it clear that the limitation of

"protection" to cash deposits was necessarily at odds with underlying congressional intention.

Those provisions of the law which involve cash deposits and the posting of security show signs of very careful drafting and a full awareness of the different language needed to describe and account for the treatment of the different types of security, both when requiring payment and when requiring adjustment or returns of what was paid or deposited. The presence of such care in a number of provisions makes it difficult to assume that inadvertence was responsible for this provision. In the end, inadvertence has to be ruled out by the aforementioned connection of these provisions to the multi-lateral agreements.

The most important reason why the court cannot say with any degree of certainty that the statute does not represent legislative intent is that it appears to conform to differences in the underlying multilateral agreements which this law was designed to implement. Thus, Article 10, Paragraph 2, of the Antidumping Code states that provisional measures "may take the form of a provisional duty or, preferably, a security—by deposit or bond—equal to the amount of the anti-dumping duty provisionally estimated." *Agreement on Implementation of Article VI of the General Agreement of Tariffs and Trade*, Art. 10, Para. 2 (1979), reprinted in *Agreement reached in the Tokyo Round of Multi Lateral Trade Negotiations*, H.R.Doc. No. 153, part 1, 96 Cong., 1 Sess. 312, 323 (1979). This establishes a distinction in the Antidumping Code between "provisional duty," which would be the equivalent of cash deposits under our law, and the posting of securities. Then, when the Antidumping Code comes to the question of what shall be done to payments or deposits made prior to the determination of the final duty to be assessed, the Code states that if the duty to be assessed *"is higher than the provisionally paid duty,* the difference shall not be collected ..." On the other hand, if the duty to be assessed "is lower than the provisionally paid duty *or the amount estimated for the purpose of the security,* the difference shall be reim-

bursed or the duty recalculated, as the case may be." *Id.* at 324 (emphases added).

This indicates to the Court that in the underlying Antidumping Code, with respect to the collection of finally determined duties which are *higher* than those provisionally paid, the only protected provisional or interim payments are those made in cash. On the other hand, if we look at the companion countervailing duty code, we find that if the definitive duty "is higher than the amount guaranteed by the cash deposit *or bond,* the difference shall not be collected ..." *Agreement on Interpretation and Application of Articles VI, XVI, and XXIII of the General Agreement on Tariffs and Trade,* art. 5, para. 6 (1979). In view of this clear distinction in the underlying international agreements, the Court cannot say that the existence of the same distinction in our law is inadvertent.

Based on its study of the statute, the legislative history, and the related international agreements, the court cannot conclude that the provision in question inadvertently left out bonds or other securities, or is otherwise so ambiguous or inconsistent that the court must read more into it. This is not a case in which the plain meaning of the provision undermines or defeats the plain purpose of the statute. It is impossible for the court to say that the legislative objective of encouraging the use of bonds or other security is paramount to the legislative purpose of harmonizing U.S. law with international agreements. The circumstances here are quite distinguishable from the leading case cited by the government, *Bob Jones Univ. v. United States,* 461 U.S. 574, 585, 103 S.Ct. 2017, 2025, 76 L.Ed.2d 157 (1983). In that case, the plain meaning of a tax law providing tax exemption for "religious, charitable ... or educational" organizations would have required tax exemption for educational institutions which practiced racial discrimination. The Internal Revenue Service ("IRS") issued a regulation expressing the requirement that organizations seeking the benefit of the exemption must conform to common law concepts of "charity" and, as part of that concept, may not engage in

racial discrimination, contrary to public policy. The Supreme Court upheld the IRS ruling on the ground that it conformed to a fundamental national public policy which permeated the laws governing tax exemption, even though it may not have been specifically mentioned in them. As noted earlier, there is no such clear cut or fundamental factor which permeates this law or militates against plain meaning in this case. If anything, the more fundamental factor in this case would appear to be the general objective of harmonizing U.S. law with the international agreements.

This situation is not clarified by further resort to legislative history. Even if we go further, we find, as the government's best historical evidence, a somewhat muddled indication in the Senate report on the Trade Agreements Act of 1979. S.Rep. No. 249, 96 Cong., 1st Sess. (1977). That segment refers to security being posted for the entries made during the interim period under discussion here, speaks of the final antidumping duty being disregarded if the security is less than the final duty determined, and finally, states that the security will be *refunded* if it has been greater than the final duty determined. The use of the word "refunded" undercuts a reading of "security" as both cash and bonds because it is only used if the subject of discussion is a cash deposit. In speaking of other security, the proper term would have been "release." Since the distinction between "refund" and "release" is adhered to throughout the law, this rather loose portion of legislative history cannot be given any controlling effect.

Moreover, there is other legislative history which could be taken to indicate that the provision under discussion was to be limited to cash deposits. For example, the House reports refers only to cash deposits. H.R.Rep. No. 317, 96th Cong. 2nd Sess. (1970). In addition, the executive branch, in its explanations to Congress of the Act's different assessment rate cap provisions for countervailing duties and antidumping duties, shows a clear distinction between the two. With respect to countervailing duties, it states that if "the amount of the countervailing duty estimated for purposes of provisional measures" differs from the final duty, then the difference shall be disregarded if the estimated duty is lower than the final duty. That statement addresses all forms of security. However, with respect to antidumping, the explanation states that if "the amount of the cash deposit collected is an estimated antidumping duty" is different from the final duty, then the difference shall be disregarded "to the extent that cash deposit is lower" than the final duty. *Compare Trade Agreements Act of 1979: Statements of Administrative Action,* H.R.Doc. No. 153, Part II, 96th Cong. 1st Sess. (1979) at 408–09 (countervailing) with 427–28 (antidumping).

For the reasons given above, the Court concludes that the provision in question appears to display an intentional singling out of cash deposits and does not cover instances in which provisional duties were secured by bonds or other security. Consequently, the Court holds that no assessment rate cap may be applied in liquidating the subject entries unless the importer paid a cash deposit for an estimated antidumping duty.

■ Zenith contends that Commerce has erred in its calculation of the deposit rate for future entries of CTVs from Taiwan. This is an issue which the court resolved in Commerce's favor in *Daewoo,* —— C.I.T. ——, 712 F.Supp. 931. Commerce relies on the percentage dumping margin found in the administrative review for the purpose of setting future duty deposits. In other words, Commerce arrived at a calculation of the percentage of antidumping duties expressed as a percentage of the total statutory USP of the entries under review. That rate of duty is applied to future entries by applying it to their normal customs entered value.

Zenith points out that in a case such as this, where Commerce must make a large upward adjustment to USP, the actual amount of duty payment resulting from the application of the weighted average margin percentage to this higher USP will not be equaled when that same rate of duty is applied to the lower entered value of future

entries which are subject to the deposit requirements. According to Zenith, the correct method for setting the deposit rate would be to take the actual duty paid on the entries under review as a percentage of *their* entered value, and then apply that percentage to the entered value of future entries as the deposit rate.

The Court agrees with Commerce that the method advocated by Zenith is not required by the law and would not necessarily result in a more accurate estimation of the duty amount that will ultimately be assessed. Section 751 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1675, sets out the procedures for reviewing and assessing antidumping duties for merchandise which is subject to an antidumping duty order. The Act states:

> Determination of antidumping duties.— for the purpose of paragraph (1)(B), the administering authority shall determine—
>
>> (A) the foreign market value and the United States price of each entry of merchandise subject to the antidumping duty order and included within that determination, and
>>
>> (B) the amount if any, by which the foreign market price of each entry exceeds the United States price of the entry.
>
> The administering authority without revealing confidential information, shall publish notice of the results of the determination of antidumping duties in the Federal Register, and that determination shall be the basis for the assessment of antidumping duties on entries of the merchandise included within the determination and for deposits of estimated duties.

The plain meaning of this provision indicates that it is sufficient for Commerce to use the antidumping duty rate determined in the review proceeding for the purpose of deposits of estimated duties. While it certainly would not be outside the authority of Commerce to use that original determination as a basis for a more refined determination of deposits in individual cases, the law does not require it. Although this may

not be the absolutely perfect procedure for setting deposits of estimated duties, it is certainly a rational one and it can certainly be justified in terms of the purposes of the law. For these reasons, the Court adheres to the views previously expressed in the *Daewoo* opinion and affirms the procedures of Commerce with respect to the deposit of estimated duties.

At the conclusion of the determination under review here, Commerce stated that it did not require a cash deposit for estimated dumping duties which were less than 0.5% and were therefore *de minimis* for cash deposits. 51 Fed.Reg. at 46,904. This amounted to the institution of a rule that would disregard any weighted-average dumping margin below 0.5% as *de minimus*. That was in conflict with this court's holding in *Carlisle Tire & Rubber Co., Div. of Carlisle Corp. v. United States*, 10 C.I.T. 301, 634 F.Supp. 419 (1986) that Commerce could not deem a margin of dumping *de minimis* unless it either promulgated a rule in accordance with the Administrative Procedure Act or explained the basis for its decision to consider a margin *de minimis*. At the time of the issuance of the determination under review here, Commerce had proposed such a rule but the rule had not yet become final.

Zenith challenges Commerce's application of the *de minimis* concept in this case, in the absence of a validly promulgated rule. Zenith also takes issue with the subsequently promulgated rule which became effective on September 16, 1987. 52 Fed. Reg. 30,660 (1987). Commerce has requested a remand to explain the reasons underlying it *de minimis* determination and characterizes Zenith's attack on the regulation as raising a hypothetical question under these circumstances. In view of Commerce's request for a remand and the possibility that the reasons for the application of a *de minimis* concept can be decided without judging the validity of the subsequent regulation, the Court will remand this issue to Commerce for an explanation of its reasons.

■ Zenith has also taken issue with the fact that Commerce, in the course of using

constructed value as the basis of comparison with USP in some instances, made adjustments to that constructed value for differences in circumstances of sale. Zenith argues that constructed value may not be adjusted for such differences. Zenith bases its argument on the premise that constructed value, even though it was moved into the structure of the provision for foreign market value in 1980, remains something completely alien to the transaction-based concept of foreign market value. According to Zenith it is merely a continuation in a different place of a prior statutory constructed value which was not subject to adjustment.

This court has previously dealt with the somewhat paradoxical situation in which circumstances-of-sale adjustments are made to a measure of product value which is based on the *nonexistence* of meaningful sales transactions and which is built up from costs of production. In *Timken Co. v. United States*, 11 C.I.T. 786, 796–803, 673 F.Supp. 495, 506–09 (1987), this Court held that Commerce may adjust constructed value for the ESP offset, a factor which has been granted the status of a difference in circumstances of sale. The Court based its decision on two subsidiary findings. First, it found that constructed value might even have been subject to adjustments prior to 1980, when it was moved under the provision for foreign market value. The Court viewed that as providing grounds for positing a congressional awareness of the possibilities of such adjustments. The second reason noted in the *Timken* opinion was that a bar to adjustment of constructed value would lead to absurd results in certain cases, results that might conceal the existence of dumping margins. It was on the latter ground that this Court followed the *Timken* opinion in *Funai Electric. Co. v. United States*, —— C.I.T. ——, 713 F.Supp. 420 (1989).

In the *Funai* case, Funai argued that when Commerce decided to use constructed value, it was restricted to using the statutory minimum 10% for home market general expenses under the authority of 19 U.S.C. § 1677b(e)(1)(B)(i). Funai contended that Commerce was not permitted to add in

additional expenses over and above that 10%, such as the specific patent royalty and technical service expenses which it had chosen to add. The Court pointed out that once Commerce had the authority to adjust constructed value, that 10% could not be treated as an inviolate amount. The Court stated that "the 10% attributed to home market general expenses is a statutorily authorized monolithic amount which represents the minimum amount of general expenses in the absence of, or unsatisfactory evidence of, general expenses in the home market."

In this case the adjustments for circumstances of sale have gone the other way and have lowered the general expenses below the 10% statutory amount. Zenith argues that even if adjustments are permitted in general, it violates the law and defies common sense to allow them to bring the amount for general expenses below 10% of the cost of materials and fabrication.

Commerce apparently takes the view that when there are *no* home market sales, so that no actual general expenses of any sort exist in the home market, constructed value automatically includes the 10% statutory minimal amount of general expenses. In that case, since there are *no* home market sales and no attendant selling expense data, no adjustments for differences in circumstance of sale can be made. However, Commerce assumes that when there are *some* home market sales, insignificant though they may be, and insufficient as they may be to establish a foreign market value, they can still be used to derive actual selling expenses for the purpose of adjusting the monolithic general expenses of the statute below the 10% mark.

In the opinion of the Court, this procedure does not comply with the law, and does not have the merit of avoiding any absurdities. If anything, it hinders any attempt to reconcile the provisions governing constructed value and the disregarding of insignificant sales with the provision for adjustments. With respect to constructed value, 19 U.S.C. § 1677b(e)(1)(B)(i) provides that the amount for general expenses *"shall not be less than 10%"* of the cost of

materials and fabrication [emphasis supplied]. In addition, 19 U.S.C. § 1677b(a)(1)(B) provides that insignificant sales shall be disregarded for the purpose of determining foreign market value. Logical consistency should dictate that if sales in the home market are so insignificant that they lead Commerce to reject them as a source of foreign market value and choose constructed value instead, the actual selling expenses associated with those insignificant home market sales should also not be relied upon for any related purposes. Given the authority to adjust constructed value for circumstances of sale, the Court sees only one way to reconcile it with a statutory minimum for general expenses and a statutory bar on the use of insignificant sales as a source of foreign market value. That way is to maintain the 10% as an amount which cannot be lowered by adjustments derived from sales which are too insignificant to support a foreign market value.

In view of the circumstances presented in this case, the Court refines its view of the permissibility of circumstances of sales adjustment to constructed value to hold that adjustments based on sales expenses from transactions which were insufficient to establish a foreign market value may not reduce the statutory minimal component of general expenses. Accordingly, the Court disallows the use of circumstances of sales adjustments in this case to the extent that they reduce constructed value general expenses to less than the statutory minimal amount. Commerce is instructed to make the appropriate changes to the constructed value calculations on remand.

Zenith argues that in this proceeding Commerce did not follow the statutory requirement to remove from ESP all expenses relating to such sales including those portions of such expenses which may occur in the home market, such as in the Exporters Overseas Marketing Department. Section 772(e)(2) of the Act, 19 U.S.C. § 1677a(e)(2), requires Commerce to remove from ESP all "expenses generally incurred by or for the account of the exporter in the United States in selling identi-

cal or substantial identical merchandise." Commerce does not dispute this allegation. It claims, however, that in this case the record was not clear as to whether expenses associated with obtaining credit, selling on credit, administrative credit, and all other expenses incurred in Taiwan on ESP sales, were included in United States or home market selling expenses. Commerce also contends that Zenith did not raise this point in a timely manner. The Court finds that this issue is properly raised, and that the state of the record does not permit a conclusion that this result was supported by substantial evidence. For these reasons the case will be remanded to Commerce for the purpose of seeing to it that home market export-related expenses are removed from ESP, not from foreign market value, and for gathering such additional information as may be necessary to accomplish this purpose.

The next issue relates to the calculation of USP for AOC, and particularly the calculations made with respect to import duties which were not collected by reason of exportation. Section 772(d)(1)(B) of the Act, 19 U.S.C. § 1677a(d)(1)(B), requires that USP be increased by "the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States." Zenith points out that, with respect to calculating the USP for AOC, Commerce added the amount of import duty associated with the home market comparison model rather than the amount of import duty forgiven on the export model. Zenith further points out that the relevant statutory language is identical to the language appearing in the immediately following subsection of the Act, governing the tax adjustment to USP. In *Zenith Elecs. Corp. v. United States*, 10 C.I.T. 268, 633 F.Supp. 1382 (1986), this Court held that the phrase "which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States," requires Commerce to add to USP the amount of tax forgiven on export models, not the amount of tax paid

on home market comparison models. Commerce does not dispute that the identical language means that the same procedure should be followed with respect to forgiven duties. However, Commerce contends that in this case it did not possess the data to calculate the duties forgiven upon export by AOC.

The Court begins its analysis of this issue from the observation, supported by the record, that there are material component differences between AOC's export models and home market models. This means that there are instances when the export model is less costly to produce than the comparison home market model because the material components of the export model are less costly than the material components of the comparison home market model. This in turn means that the amount of duty forgiven on the export model would be lower than the amount of duty paid on the comparison home market model. While this may not be true in all cases, it is sufficiently established in the record to contradict Commerce's assertion that the duty figures for the home market models are the best information available concerning the duty amounts forgiven on export models.

In the opinion of the Court, the controlling factor here is not whether or not AOC's failure to supply information more closely connected to export models was willful or excusable. The controlling factor is that the ascertainment of forgiven duties on exported merchandise is something which must be properly linked to the merchandise itself, particularly when the record shows differences in material component costs between export and home market models.

In the Court's view the questionnaire issued to AOC should have elecited a response related to the reporting of duties forgiven on exports. The questionnaire requested "duties and taxes uncollected or rebated to exporter, not already included in the [export] selling price [which are already covered by request item (i)], and included in the home market price." P.M.R. No. 1 at frame 83, item 2g. The phrase referring to "included in the home market price" is there to warn against reporting duties forgiven on exports which are also forgiven on home market merchandise. It does not call for submission of the home market duty amounts as a substitute for the amounts actually forgiven upon exportation of the exported merchandise.

The court is not persuaded by AOC's argument that home market model duties can serve as the best indication of the duties that would have been collected on the exported merchandise. AOC's premise appears to be that the calculation can be made as if the exported merchandise is going to be sold in the home market. That is not the thrust of the analysis made by the court with respect to forgiven tax, and it should not be the thrust of the investigation with respect to forgiven duties. The calculation required by statute is one which arrives at the amount of duty which would have been collected on the export if those exports were not excused from payment.

In light of the above, the Court concludes that Commerce's addition to USP of the duties paid with respect to home market models, rather than the duties forgiven with respect to export models is unlawful. This issue is remanded to Commerce for redetermination. Inasmuch as this is the first clarification of this provision by the court, Commerce may, in its discretion, request additional information from AOC on this subject.

█ Zenith contends that Commerce failed to investigate whether Shin Shirasuna's sales to Canada constituted a fictitious market. Those sales were used by Commerce to establish a foreign market value for Shin Shirasuna's CTVs under the authority of 19 U.S.C. § 1677b(a)(1)(B). That provision allows Commerce to look to sales to third countries other than the United States, as a basis for foreign market value, if sales in the foreign home market are too small in relation to the quantities sold for exportation. See 19 C.F.R. § 353.4(a). Since Shin Shirasuna did not have adequate sales in its home market for comparison with its U.S. sales, Commerce looked to sales to Canada and found that the volume

of those sales would have been sufficient to establish a basis for foreign market value if those sales had been made in the home market.

Zenith urged Commerce to investigate whether those sales in Canada were fictitious. *See* M.C.R. No. 8 at frames 2347, 2402–04. Commerce stated that since it had found the Canadian sales to form a viable market, the market could not be fictitious. 52 Fed.Reg. at 46,897 (Comment 4). That response did not sufficiently fulfill Commerce's obligation under the law. The fictitious sales provisions in § 773(a)(1) of the Act, 19 U.S.C. § 1677b(a)(1) and the regulations in 19 C.F.R. § 353.18 require consideration of whether the transactions in issue are "pretended" sales or sales "intended" to establish a fictitious market. Those provisions are independent of the existence of a market of viable size. In other words, it is entirely possible that a market of viable size can have sales within it which are fictitious or pretended. The Court's review of the record indicates that there was sufficient material in the record to raise a reasonable suspicion that some or all of the Canadian sales were contrived for the purpose of serving as the basis for a favorable FMV calculation. *See* C.M.R. No. 8 at frames 2215–17. It is the opinion of the Court that the closeness of sale dates and prices in the United States and Canada warranted investigation to determine whether a manipulation had taken place in which a related buyer in the foreign market ordered identical merchandise on certain dates at certain prices in order to manipulate the fair market value of the imports to the United States and thereby minimize the antidumping duty liability. The case is therefore remanded to Commerce for such an investigation.

■ Zenith's claim that Commerce erred in calculating a constructed value for one Capetronic sale. Specifically, Zenith argues that Commerce had before it in the record the specific material and fabrication costs incurred for those production runs which accounted for the precise units involved in the sale, but erroneously chose to use a weighted average of the materials

and fabrication costs for *all* units of the relevant model. Commerce and Capetronic argue that Zenith's assertion about the presence of the exact cost of materials and fabrication in the record is without evidentiary support; that in any event Commerce had the authority to use a weighted average of all production runs, and that Zenith is precluded from raising this issue because of its failure to exhaust administrative remedies.

The Court is persuaded that Zenith's failure to raise this issue after the preliminary determination was excusable because it had no reason to suspect that Commerce had used the technique of averaging materials and fabrication costs for all production runs. At that time, it was reasonable for Zenith to attribute the discrepancy between its calculations and those of Commerce to a numerical transposition error by Commerce which, when corrected, brought Zenith's results close to those of Commerce, and left the difference which Zenith could reasonably have believed was attributable to the use of different exchange rates and rounding rules. Accordingly, this situation falls within those matters in which the application of a strict rule of exhaustion would be inappropriate. *Rhone Poulenc, S.A. v. United States*, 7 C.I.T. 133, 136, 583 F.Supp. 607, 611 (1984). *See also Serampore Industries Pvt. Ltd. v. U.S. Dept. of Commerce*, 12 C.I.T. 825, 696 F.Supp. 665 (1988).

Upon review of the record, the Court finds that the only reasonable conclusion which can be reached from the production records provided by Capetronic and the time lag from production to exportation, the shipping records for other sales, as well as the inventory situation, is that the sale under examination was derived from the production runs identified by Zenith. No other combination of production runs would yield the number of units involved. On this basis, the only conclusion that can be reached is that the record does indeed contain the exact production information regarding the sale in issue.

■ This leaves only the question of whether Commerce nevertheless has the

authority to ignore that evidence and calculate a weighted average. Section 777A of the Act, 19 U.S.C. § 1677f–1(a)(1) authorizes Commerce to calculate a weighted average. *See also* 19 C.F.R. § 353.23(b). However, that authority is granted only where "a significant volume of sales is involved or a significant number of adjustments to price is required." The Court is of the opinion that, with respect to this one United States sale and the small number of production runs which contributed to it, the underlying rationale for the use of a weighted average does not exist. In addition, the Court notes that Commerce made only three adjustments to constructed value, a circumstance which is not so momentous as to justify the rejection of exact data in favor of weighted average. In sum, the Court holds that, in this instance, when Commerce had before it the exact production data relating to a single United States sale, it was not justified in making use of weighted average costs of materials and fabrication. The case is remanded for Commerce to recalculate Capetronic's margins in accordance with this finding.

Zenith has also contended that, with respect to Shirasuna, Commerce improperly failed to remove from USP the value of certain expenses subject to confidentiality which Shirasuna included in at least some sales to the United States. The expense involved is one which by definition is not included in price, and by supplying it Shirasuna incurred an expense which must be removed from USP. This matter is therefore remanded for correction by Commerce.

Finally, the government has conceded that the programming error identified by Zenith in its brief-in-chief at pages 88–100 should be corrected for AOC International and Tatung Co., and this aspect of the case is also remanded for correction by Commerce.

For the reasons given above, the case is remanded for Commerce to issue a redetermination consistent with this opinion and to transmit said redetermination to the Clerk of the Court within 90 days. In all other respects the motions pending before the Court are denied.