**Slip Op. 01-139**

**United States Court of International Trade**

|  |  |
|---|---|
| U.S. STEEL GROUP, A UNIT OF USX CORPORATION AND BETHLEHEM STEEL CORPORATION, <br><br>              Plaintiffs, <br><br>      v. <br><br> UNITED STATES, <br><br>              Defendant, <br><br>              and <br><br> NIPPON STEEL CORPORATION, <br><br>              Defendant-Intervenor. | Before: Pogue, Judge <br><br> Court No. 00-03-00136 <br><br> **Public Version** |

[Plaintiffs' motion for judgment on the agency record denied; final results of agency administrative review sustained.]

Decided: November 30, 2001

Skadden, Arps, Slate, Meagher & Flom LLP (Robert E. Lighthizer, John J. Mangan, Jeffrey D. Gerrish), for Plaintiffs.

Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director, Michele D. Lynch, Janene Marasciullo, Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; Stephen M. De Luca, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel, for Defendant.

Gibson, Dunn & Crutcher LLP (Daniel J. Plaine, Andrea F. Dynes, Merritt R. Blakeslee, Lisa A. Murray), for Defendant-Intervenor.

**OPINION**

**Pogue, Judge**:  This matter is before the Court on the motion of U.S. Steel Group, a unit of USX Corporation, and Bethlehem Steel Corporation ("Plaintiffs"), for judgment on the agency record pursuant to USCIT Rule 56.2.  Plaintiffs challenge the Department of Commerce's ("Commerce") calculation of the dumping margin for Nippon Steel Corporation ("NSC") in Certain Corrosion-Resistant Carbon Steel Flat Products from Japan: Final Results of Antidumping Duty Administrative Review, 65 Fed. Reg. 8,935 (Dep't Commerce Feb. 23, 2000) ("Final Results").  The Court denies Plaintiffs' motion and sustains the final results of the administrative review.

**Background**

On February 23, 2000, Commerce published its Final Results in the fifth administrative review of the antidumping duty order on corrosion-resistant carbon steel flat products from Japan.  The period of review was August 1, 1997 through July 31, 1998.  The review covered exports of two Japanese manufacturers, including NSC.[1]

NSC sells corrosion-resistant carbon steel flat products ("CRS") to both the Japanese and U.S. markets.  In calculating the dumping margin for NSC, Commerce compared sales to the same

_____

[1] The review also covered Kawasaki Steel Corporation, which is not a party to the current action.

customer in both the home and U.S. markets.  The customer, Customer A, is a trading corporation affiliated with Corporation B.[2]  See Petitioner's Factual Information Re: NSC, Dun & Bradstreet Company Report, Customer A, Pro. Doc. No. 23 at 1, 5, 11 (Jan. 19, 1999).[3] Corporation B uses a substantial quantity of NSC's products,[4] and makes most of its purchases of NSC's CRS through Customer A.  See Petitioners' Comments on NSC Response to Sections A-D of the Antidumping Questionnaire, Pro. Doc. No. 22  at 28 (Jan. 15, 1999) ("Petitioner's Comments on NSC Response to Sections A-D"); NSC Third Supplemental Questionnaire Response, Pro. Doc. No. 40 at 2 (May 24, 1999).   NSC enters into price negotiations with both Customer A and Corporation B to set price ranges but not final prices.  NSC also offers certain pricing arrangements to trading companies and end users,[5] including Corporation B.  See NSC Section A Response at A-20 - A-22.  In the U.S., Customer A is the importer

---

[2] Throughout this opinion, [                                    ] is referred to as Customer A and [                              ] is referred to as Corporation B.

[3] Cites to the administrative record specify whether reference is made to a public document ("Pub. Doc.") or to a proprietary document ("Pro. Doc.").

[4] Corporation B is the [                                    ] of NSC's products.  See Petitioners' Comments on NSC Response to Sections A-D, Pro. Doc. No. 22 at 28; see also NSC Sales Verification Memorandum, Pro. Doc. No. 59, Ex. 37 at 70, 72 (July 22, 1999) ("Verification Memo.").

[5] NSC [                              ] trading companies and [               ], including Corporation B.  See NSC Response to Section A of the Antidumping Questionnaire, Pro. Doc. No. 1 at A-20 - A-22 (Oct. 22, 1998) ("NSC Section A Response").

of record, see NSC Response to Sections B-D of the Antidumping Questionnaire, Pro. Doc. No. 16, at C-46 (Dec. 8, 1998), and as such is responsible for payment of antidumping duties.

Plaintiffs assert (1) that the use of sales to the same customer in both the home and U.S. markets to determine normal value results in an unfair comparison, and (2) that the sales in question were outside the ordinary course of trade and should have been excluded from the normal value calculations.

## Standard of Review

The Court will uphold an antidumping review determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

"Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (internal citations and quotations omitted); Micron Tech., Inc. v. United States, 117 F.3d 1386, 1393 (Fed. Cir. 1997). The possibility of drawing two inconsistent conclusions from the evidence does not mean that an agency's finding is not supported by substantial evidence. Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). A decision will be reviewed on the grounds invoked by the agency, see SEC v. Chenery Corp., 332 U.S. 194, 196 (1947), and the Court

may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974).


## Discussion

**I. Fair Comparison**

In calculating a dumping margin, Commerce compares the price of a good in the U.S. to its price in the exporting country, known as its normal value.[6] 19 U.S.C. § 1677b(a) requires that this comparison be "fair," stating that "a fair comparison shall be made between the export price or constructed export price and normal value." The statute further states that "[i]n order to achieve a fair comparison . . . normal value shall be determined as follows . . . ." Id. The paragraphs that follow set out the steps Commerce must take in determining normal value, and include adjustments and exclusions of sales intended to ensure the accuracy of the normal value determination and the resultant dumping margin

---

[6] Normal value is

> the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price.

19 U.S.C. § 1677b(a)(1)(B).

calculation.

In the instant case, Commerce included home market sales from NSC to Customer A in its normal value determination, and also used sales to Customer A in determining the U.S. price. The dumping margin is therefore calculated using sales to the same customer in both markets. Plaintiffs contend that in using sales to the same customer in both markets, Commerce failed to make the "fair comparison" required by 19 U.S.C. § 1677b(a). Plaintiffs argue that both the seller and the customer had financial interests in avoiding antidumping duties and incentives to mask any dumping that was taking place, which rendered reported prices unreliable, see Pl.'s Mem. Supp. Mot. J. Agency R. ("Pl.'s Mem.") at 13, and created the potential for price manipulation. Id. at 21. Plaintiffs assert that these risks caused the price comparison to be unfair, and required the exclusion of the transactions even without actual evidence of inaccurate price reporting or price manipulation. See id. at 21-22.

Plaintiffs refer to three cases to support their claim that Commerce should have excluded from the price comparison the sales to Customer A in both markets. Koenig & Bauer-Albert AG v. United States, 22 CIT __, 15 F. Supp. 2d 834 (1998), involved the alteration of contract prices after the filing of an antidumping petition. The court upheld Commerce's decision to base the price comparison on the original, rather than the adjusted, contract

price, because the adjusted, post-petition prices were considered potentially suspect and open to manipulation and Commerce had been unable to verify them. See Koenig, 22 CIT at __, 15 F. Supp. 2d at 840.

Koyo Seiko Co. v. United States, 20 CIT 920, 936 F. Supp. 1040 (1996), aff'd in part, vacated in part by 121 F.3d 726 (Fed. Cir. 1997), involved Commerce's discretionary decision to employ a set-splitting methodology to calculate the foreign market value of a product. The court noted that "[i]n the absence of set-splitting, a respondent may compel the use of constructed value by selling sets in one market and single [products] in another." Id. at 930, 936 F. Supp. at 1048. Concerned that such a practice could impede the calculation of the most accurate foreign market value possible and help to circumvent the antidumping laws, the court deferred to Commerce's reasonable choice of methods for achieving the most accurate calculation. Id.

Finally, in Zenith Elecs. Corp. v. United States, 15 CIT 394, 770 F. Supp. 648 (1991), rev'd on other grounds, 77 F.3d 426 (Fed. Cir. 1996) this Court remanded for further investigation the issue of whether certain sales were fictitious because "there was sufficient material in the record to raise a reasonable suspicion that some or all of the Canadian sales were contrived for the purpose of serving as the basis for a favorable FMV calculation." Zenith, 15 CIT at 406, 770 F. Supp. at 659 (emphasis supplied). Under Zenith, Commerce has a duty to investigate further where

there is sufficient evidence on the record to raise a reasonable

suspicion that the sales in question are not representative of the

market.  See id. at 406-07, 770 F. Supp. at 659.

These three cases are distinguished by the fact that in each

of them, Commerce had reason to believe the sales or prices in

question were unreliable in some manner.  In the instant case,

however, Commerce did not find evidence that would raise a

reasonable suspicion that the reported prices were unreliable or

subject to manipulation, or that the sales in question were not

representative of the market and should have been excluded.  In

fact, Commerce was able to verify NSC's pricing practices and

relationships with Customer A and Corporation B.  See Verification

Memo.  Plaintiffs apparently propose that Commerce has a duty to

exclude sales from the margin calculation even in the absence of

evidence suggesting their unreliability, but this proposition is

unsupported in the statute, regulations, and case law.[7]

---

[7] Plaintiffs do not assert that Commerce failed to accurately
follow the procedures set out in the statute; rather, Plaintiffs
argue that the term "fair comparison" creates a separate, general
requirement of fairness under § 1677b(a), such that the totality
of the circumstances surrounding the normal value determination
must be inherently "fair" in order to meet the statute's
requirements. See Pl.'s Mem. at 13-16.  The Court has not found,
nor have Plaintiffs presented, any authority supporting a
construction of "fair comparison" as a separate or freestanding
requirement.  The Court, however, concludes on the basis of the
record in this matter that Commerce did in fact achieve a fair
comparison in compliance with the statute, and does not reach the
question of whether the statute includes a separate requirement
of fairness.

In the administrative review prior to the matter at issue here, Commerce found that it is not unusual for there to be sales to both markets through the same customer. Final Results at 8,940; see also Certain Corrosion-Resistant Carbon Steel Flat Products From Japan: Final Results of Antidumping Duty Administrative Review, 64 Fed. Reg. 12,951, 12,954 (Dep't Commerce Mar. 16, 1999) ("Fourth Review") ("That the customer in question purchased the identical product in both markets is not, in itself, unusual, nor suggestive of an intentional evasion or circumvention of the antidumping duty law."). According to Commerce, the existence of sales to the same customer in both markets involved in the comparison "is not, on its own, sufficient grounds to reject comparisons of such sales in calculating the dumping margin." Mem. U.S. Opp'n to Mot. J. Agency R. ("Def.'s Mem.") at 13-14 (quoting Pl.'s Mem. at 17); see also Final Results at 8,937-38 (noting that the fact that "the sales to both markets [were] made to the same customer" is not "compelling").

In the course of its investigation in the fifth administrative review, Commerce conducted a verification of NSC's responses to Commerce's questionnaires, including responses concerning sales processes, pricing arrangements, and NSC's relationships with Customer A and Corporation B. See Verification Memo. Commerce verified that "NSC's sales negotiation process with [Customer A] in the home market is the same as that with its other unaffiliated customers." Def.'s Mem. at 5 (citing Verification Memo. at 2-3);

see also Verification Memo. at 10-11 (describing the sales process

with Customer A and Corporation B); NSC Section A Response at A-20

- A-22 (describing the sales process with unaffiliated companies in

general).  Commerce also verified that "[c]hanges in NSC's prices

since 1991 were applied to all customers" and that "NSC's prices to

[Corporation B] [always varied from] those for other . . .

customers." Def.'s Mem. at 6 (citing Verification Memo. at 11, Ex.

37).  As noted by the Defendant, if price manipulation were taking

place, Commerce would have expected to find certain price

adjustments for products destined for Corporation B since the

implementation of the antidumping order.  Id. at 14-15.  However,

Commerce's findings regarding NSC's pricing and sales practices did

not suggest any price adjustments which might indicate price

manipulation to affect dumping margins.[8]  See id. at 6, 15-16;

Verification Memo. at 10-11, Ex. 37 at 69; NSC Supplementary

Response to Sections A-D of the Antidumping Questionnaire, Pro.

Doc. No. 27, Pub. Doc. No. 86 at 11-12 (Feb. 18, 1999).

---

[8] Exhibit 37 indicates that [

]; for other end users [
].  See Verification Memo.,
Ex. 37 at 69; Def.'s Mem. at 6, 14-15.  [
] between 1991 and the period of review [      ] for
Corporation B, [        ] for other end users.  Verification
Memo., Ex. 37 at 69; Def.'s Mem. at 15.  Additionally, Commerce
verified that [
].  See
Verification Memo. at 10; NSC Supplementary Response to Sections
A-D of the Antidumping Questionnaire, Pro. Doc. 27, Pub. Doc. 86
at 11-12 (Feb. 18, 1999).

Finally, Defendant notes that it would be permissible for NSC, Customer A, and Corporation B to agree to reduce home market prices for goods destined to Corporation B.  See Def.'s Mem. at 19-20. The purpose of the antidumping statute is to prevent dumping, which entails reducing or eliminating discrepancies in pricing between the U.S. and foreign markets.  See Lasko Metal Prods., Inc. v. United States, 43 F.3d 1442, 1446 (Fed. Cir. 1994)(stating that "[t]he purpose of the [Tariff Act of 1930] is to prevent dumping"); Koyo Seiko Co. v. United States, 20 F.3d 1156, 1159 (Fed. Cir. 1994) (stating that the purpose of the antidumping statute is "to protect domestic manufacturing against foreign manufacturers who sell at less than fair market value"); see also Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990)(indicating that the "basic purpose of the statute" is "determining current margins as accurately as possible").  This may be achieved by either raising U.S. prices or by lowering the home market prices. See Fourth Review at 12,954 (stating that "it is permissible for a respondent to reduce or eliminate dumping either by raising its U.S. prices or by lowering its home market prices of merchandise subject to the order") (citing Notice of Final Results of Antidumping Duty Administrative Review: Furfuryl Alcohol from the Republic of South Africa, 62 Fed. Reg. 61,084, 61,085 (Dep't Commerce Nov. 14, 1997); Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from Japan, and Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof,

From Japan; Final Results of Antidumping Duty Administrative
Reviews and Termination in Part, 62 Fed. Reg. 11,825, 11,831 (Dep't
Commerce Mar. 13, 1997) (stating that a firm has discretion to
choose a method for eliminating price discrimination, and that "a
respondent may act to eliminate the price differential by (1)
increasing its U.S. prices, (2) lowering its home market prices, or
(3) undertaking a combination of the two").

The record shows no evidence of inaccurate reporting or price
manipulation by NSC, Customer A, and Corporation B.  Based on this
record, Commerce concluded that there was insufficient indication
of the potential for price manipulation to warrant exclusion of the
sales.  Cf. Koenig, 22 CIT at __, 15 F. Supp. 2d at 840-41.
Because Commerce's conclusion is based on reasonable inferences
drawn from evidence in the record, it is supported by substantial
evidence.

In addition, nothing in the statute requires Commerce to
investigate further.  The statute requires Commerce to verify
information but leaves the scope of verification and the procedures
for conducting it to Commerce's discretion.  See 19 U.S.C. §
1677m(i); see also 19 C.F.R. § 351.307.  This Court has held that
when evidence reaches the level of reasonable suspicion, Commerce
must investigate further.  See Zenith, 15 CIT at 406-07, 770 F.
Supp. at 659.  But the mere possibility that prices could be
manipulated is insufficient grounds to require the agency to

disregard sales in the absence of evidence creating a basis for reasonable suspicion of actual manipulation.[9]   Accordingly, the agency's decision is in accordance with law.


## II. Ordinary Course of Trade

As noted above, 19 U.S.C. § 1677b(a) requires that in calculating a dumping margin, a "fair comparison shall be made between the export price or constructed export price and normal value."   One criterion for the normal value determination is that

---

[9] Commerce disregards sales due to the possibility of price manipulation when dealing with transactions among affiliated entities.  See SSAB Svenskt Stal AB v. United States, 21 CIT 1007, 1009, 976 F. Supp. 1027, 1030 (1997) (stating that "Commerce's normal practice is to disregard the manufacturer's prices to its related distributors or dealers in calculating foreign market value unless the manufacturer demonstrates to Commerce's satisfaction that the prices are at arm's length"); see also Koenig & Bauer-Albert AG v. United States, 24 CIT __, __, 90 F. Supp. 2d 1284, 1287 & n.5 (2000), aff'd in part, vacated in part by Koenig & Bauer-Albert AG v. United States, 259 F.3d 1341 (Fed. Cir. 2001) (noting that "[i]n determining whether to collapse related or affiliated companies, the Department must decide whether the affiliated companies are sufficiently intertwined as to permit the possibility of price manipulation")(quoting Notice of Final Determination of Sales at Less Than Fair Value: Certain Pasta from Italy, 61 Fed. Reg. 30,326, 30,351 (Dep't Commerce June 14, 1996)); FAG (U.K.) Ltd. v. United States, 22 CIT __, __, 24 F. Supp. 2d 297, 302 (1998) (stating that "Commerce collapses parties when it determines that the companies are so interrelated to each other that there is a possibility of price manipulation").  The Court has found no authority suggesting that Commerce disregard sales in other circumstances due to the mere possibility of price manipulation, without some further evidence suggesting that manipulation is a genuine risk.  Cf. Fed.-Mogul Corp. v. United States, 20 CIT 234, 263-64, 918 F. Supp. 386, 411-12 (1996) (upholding Commerce's decision to use transfer prices where Commerce verified random sample prices and where there was no evidence of price manipulation).

the sale is "in the ordinary course of trade."[10]  The purpose of the ordinary course of trade provision is to avoid a calculation of normal value and dumping margins that is based on sales that are not representative of the market in question.  <u>Cemex, S.A. v. United States</u>, 133 F.3d 897, 900 (Fed. Cir. 1998) (quoting <u>Monsanto Co. v. United States</u>, 12 CIT 937, 940, 698 F. Supp. 275, 278 (1988)).

Ordinary course of trade is defined in 19 U.S.C. § 1677(15) as "the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind."  The statute explicitly labels two types of transactions as outside the ordinary course of trade.[11]  In cases

---

[10] See the definition of normal value as stated in 19 U.S.C. § 1677b(a)(1)(B) in note 6, <u>supra</u>.

[11] 19 U.S.C. § 1677(15) states that

> The administering authority shall consider the following sales and transactions, among others, to be outside the ordinary course of trade:
> (A) Sales disregarded under section 1677b(b)(1) of this title.
>
> (B) Transactions disregarded under section 1677b(f)(2) of this title.

Section 1677b(b)(1) addresses prices that are less than the cost of production, while § 1677b(f)(2) addresses transactions between affiliated parties.  The phrase "among others" indicates that these two exclusions are not the only permissible exclusions.  This Court has found that the statute and legislative history are "ambiguous as to what constitutes a sale

not falling within the statutory exclusions, Commerce has discretion to determine on a case-by-case basis which transactions fall outside the ordinary course of trade. See Torrington Co. v. United States, 25 CIT __, __, 146 F. Supp. 2d 845, 861-62 (2001); Bergerac, N.C. v. United States, 24 CIT __, __, 102 F. Supp. 2d 497, 507 (2000). Commerce's procedures for making an ordinary course of trade determination are found in 19 C.F.R. § 351.102 (2000). The regulations require examination of the totality of the circumstances in order to avoid basing home market value on sales or transactions that are "extraordinary for the market in question." 19 C.F.R. § 351.102(b). The regulations state that

> [t]he Secretary [of Commerce] may consider sales or transactions to be outside the ordinary course of trade if the Secretary determines, based on an evaluation of all of the circumstances particular to the sales in question, that such sales or transactions have characteristics that are extraordinary for the market in question.

Id. The ordinary course determination is highly fact-specific, and Commerce looks at all the circumstances surrounding the transactions in question. It does not focus on a single circumstance in isolation. See NSK Ltd. v. United States, slip op. 01-69, at 37 (CIT June 6, 2001); Bergerac, 24 CIT at __, 102 F. Supp. 2d at 505, 507, 509; Murata Mfg. Co., Ltd. v. United States, 17 CIT 259, 264, 820 F. Supp. 603, 607 (1993). Section 351.102(b)

_____

outside the ordinary course of trade." NSK Ltd. v. United States, slip op. 01-69, at 37 (CIT June 6, 2001).

provides additional examples of transactions considered outside the

ordinary course of trade, including those involving

> off-quality merchandise or merchandise
> produced according to unusual product
> specifications, merchandise sold at
> aberrational prices or with abnormally high
> profits, merchandise sold pursuant to unusual
> terms of sale, or merchandise sold to an
> affiliated party at a non-arm's length price.

19 C.F.R. § 351.102(b).

Commerce determines what is ordinary for the market in

question by looking at market conditions, practices, and other

sales. It then compares the transactions in question to see if

they exhibit characteristics that are extraordinary for the market.

See, e.g., NTN Bearing Corp. of Am. v. United States, 25 CIT __,

__, 155 F. Supp. 2d 715, 733 (2001); Mantex, Inc. v. United States,

17 CIT 1385, 1402-03, 841 F. Supp. 1290, 1305-06 (1993). Sales

with characteristics that are extraordinary for the market may be

excluded. 19 C.F.R. § 351.102(b); Torrington, 25 CIT at __, 146 F.

Supp. 2d at 860-62.

The party seeking to exclude sales from the price comparison

has the burden of demonstrating that the sales in question are

extraordinary for the market and outside the ordinary course of

trade. Bergerac, 24 CIT at __, 102 F. Supp. 2d at 509, NTN Bearing

Corp. of Am. v. United States, 19 CIT 1165, 1172, 903 F. Supp. 62,

68-69 (1995); Murata, 17 CIT at 264, 820 F. Supp. at 606. Absent

adequate evidence of extraordinary characteristics, Commerce

includes the sales in its margin calculation. See NTN Bearing

Corp., 25 CIT at __, 155 F. Supp. 2d at 733; Torrington, 25 CIT at

__, 146 F. Supp. 2d at 862-63; Bergerac, 24 CIT at __, 102 F. Supp.

2d at 509.

The transactions in question here are within neither the

specifically excluded categories in 19 U.S.C. § 1677(15) nor the

examples in 19 C.F.R. § 351.102(b).[12]  As the instant case is not

explicitly addressed in the statute and regulations, Commerce was

required to examine the totality of the circumstances to determine

whether the sales are within the ordinary course of trade.  The

parties to this action acknowledge Commerce's discretion to

determine whether a sale or transaction is in the ordinary course

of trade.[13]  See Pl.'s Mem. at 25; Def.'s Mem. at 24; Def. Int.'s

---

[12] There is no indication that the sales were below cost, see
19 U.S.C. § 1677b(b)(1), or that the sales were between
affiliates at non-market prices.  See 19 U.S.C. § 1677b(f)(2).
There is also no indication that the sales involve abnormally
high profits, unusual product specifications, or unusual terms of
sale.  See 19 C.F.R. § 351.102(b).

[13] The Statement of Administrative Action, accompanying H.R.
Rep. No. 103-826 (1994), reprinted in 1994 U.S.C.C.A.N. 4040
("SAA"), accompanying the U.S. implementing legislation for the
Uruguay Round Antidumping Agreement is "an authoritative
expression by the United States concerning the interpretation and
application of the Uruguay Round Agreements and this Act in any
judicial proceeding in which a question arises concerning such
interpretation or application."  19 U.S.C. § 3512(d).
The SAA states that "Commerce may consider other types of
sales or transactions to be outside the ordinary course of trade
when such sales or transactions have characteristics that are not
ordinary as compared to sales or transactions generally made in
the same market."  SAA at 834.  The SAA further states that
although section 771(15) (19 U.S.C. § 1677(15)) does not
establish an exhaustive list of excluded transactions, "the
Administration intends that Commerce will interpret section
771(15) in a manner which will avoid basing normal value on sales

Mem. Opp'n Pl.'s Mem. Supp. Mot. J. Agency R. at 32.

In its Final Results here, Commerce notes that the greater the volume of sales sought to be excluded as outside the ordinary course of trade, the more evidence is required to support exclusion. Final Results at 8,940.[14] Plaintiffs assert that the sales in question are outside the ordinary course of trade because (1) there is a "'discernable pattern of lower home market sales prices' to [Corporation B] when compared to home market sales of the same merchandise to other customers," Pl.'s Mem. at 28 (referring to the Fourth Review at 12,955), and (2) there existed financial incentives and opportunities for NSC, Corporation B, and Customer A to manipulate prices. See Pl.'s Mem. at 30, 32.

Commerce concluded that the sales were in the ordinary course of trade. First, Commerce noted that the volume of home market sales in question is very large. "[T]he existence of a small quantity of sales of a certain type is one factor Commerce considers when assessing whether sales had been made outside the ordinary course of trade." Final Results at 8,940 (citing Mantex,

_____

which are extraordinary for the market in question, particularly when the use of such sales would lead to irrational or unrepresentative results." Id. Thus, the SAA indicates that Congress granted Commerce interpretive authority to determine whether transactions are in the ordinary course of trade.

[14] When Commerce does exclude sales as outside the ordinary course of trade, it must provide a complete explanation of its reasons for excluding the sales. Bergerac, 24 CIT at __, 102 F. Supp. 2d at 509; NTN Bearing Corp. of Am. v. United States, 19 CIT 1221, 1229, 905 F. Supp. 1083, 1091 (1995).

17 CIT at 1405-06, 841 F. Supp. at 1307-08 (1993)).  Whether sales

were outside the ordinary course depends on whether they are unlike

"sales of merchandise of the same class or kind generally made in

the home market."  Final Results at 8,940.  The greater the volume

of sales in question,

> the more difficult it becomes to separate the
> sales in question from those 'generally' made
> in the home market.  Therefore, we believe
> that as the percentage of sales in question
> rises, so should the overall evidentiary
> requirements supporting a finding of sales
> outside the ordinary course of trade be all
> the more rigorous.

Id. at 8,940.

Ultimately, Commerce "[did] not find the record evidence

determinative in either direction" with regard to relative pricing.

Id.  As noted earlier, Commerce's investigation found no evidence

of price manipulation.  See supra p. 9-10.  Further, Commerce noted

that "the mere presence of evidence, or even the actual existence,

of lower average prices to one unaffiliated customer" is not

necessarily sufficient evidence to consider a sale to be outside

the ordinary course of trade.  Final Results at 8,940.  Commerce

also stated that it must evaluate "all the circumstances particular

to the sales in question."  Murata, 17 CIT at 264, 820 F. Supp. at

607 (internal citations and quotations omitted).  Thus, Commerce

noted the existence of non-price factors relevant to its

determination, including "the relative volume of sales to the

customer in both markets" and the fact that sales to the same

customer in both markets were not unusual.[15]  Final Results at

8,940.   Sales of NSC's products destined for Corporation B

constitute a substantial percentage of total NSC sales, see

Verification Memo., Ex. 37 at 72, while sales destined for the U.S.

market constitute a smaller percentage of total NSC sales.  See NSC

Quantity and Value Reconciliation, Pro. Doc. No. 49, QV Summary

Worksheet at 1-2 (June 8, 1999).  Further, the high volume of home

market sales and the low volume of U.S. sales also suggest that

there is little commercial incentive for NSC to manipulate its home

market prices to reduce the dumping margin, which will affect only

a small percentage of its total sales.  Final Results at 8,940; see

also Fourth Review at 12,955.  NSC, Customer A, and Corporation B

have a long-standing commercial relationship, and Corporation B is

a significant home market end user of CRS and of NSC's output.  See

Verification Memo. at 11 (indicating that the relationship dates

from at least 1991) and at Ex. 37 at 70,72 (showing the proportion

---

[15] Commerce stated

> We also find that the non-price factors we
> considered in support of our finding in the
> fourth review (i.e., the relative volume of
> sales to the customer in both markets
> suggested there was little commercial
> incentive for the respondent to engage in the
> suppression of home market prices to eliminate
> hypothetical margins; there was nothing
> unusual about the fact that there were sales
> made to both markets through one customer) are
> equally applicable in this review.

Final Results at 8,940.

of NSC's products sold to Corporation B).  These facts provide evidence of legitimate commercial reasons leading NSC to enter into certain pricing and sales arrangements[16] with Customer A and Corporation B.

Plaintiffs attempt to inflate the significance of the pricing treatment provided to Corporation B by applying the arm's length test for price comparability, used to assess whether prices in transactions between <u>affiliates</u> are at market rates.  The test requires the prices paid by affiliates to be 99.5% of the prices paid by unaffiliated parties in order to be considered market rate.  Plaintiffs offer no authority supporting the use of the test to evaluate transactions between <u>unaffiliated</u> parties, as are present here.  Rather, Plaintiffs suggest that the purpose of the test supports extending its use to unaffiliated parties.  According to Plaintiffs, the test is used to determine whether prices are influenced by a relationship between the parties, and therefore is appropriate to use here.  However, there is no authority supporting the extension of the test to transactions between unaffiliated companies.  Moreover, it is logical that Commerce would apply a different standard and procedure in evaluating transactions between affiliates, which are less transparent and less amenable to verification than transactions between unaffiliated entities.

---

[16] Such pricing and sales arrangements [
        ].  <u>See</u> <u>supra</u> note 5; <u>see also</u> Verification Memo., Ex. 37 at 69.

Plaintiffs have the burden of providing sufficient evidence to justify exclusion of the sales as outside the ordinary course of trade.  In the absence of sufficient evidence to justify exclusion, transactions are considered in the ordinary course of trade and are included in the price comparison.  Plaintiffs' only evidence supporting exclusion of the sales is the pricing treatment[17] for merchandise destined for Corporation B.  See Pl.'s Mem. at 28-30. Analyzing the facts gathered during its investigation, Commerce drew reasonable inferences from those facts to conclude that the sales were not outside the ordinary course of trade as there were legitimate commercial reasons why such a pattern might exist. Accordingly, Commerce's decision to consider the sales in the ordinary course of trade is supported by substantial evidence on this record.

---

[17] Namely, a [                                                    ].

## Conclusion

For the reasons discussed in this opinion, Commerce's Final Results are sustained and Plaintiffs' motion for judgment upon the agency record is denied.

_____
Donald C. Pogue
Judge

Dated:     November 30, 2001
           New York, New York