Slip Op. 00-71

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| BERGERAC, N.C., | : |
| Plaintiff, | : |
| v. | : |
| UNITED STATES, | : |
| | : **Court No. 98-10-03045** |
| Defendant, | : **BEFORE: CARMAN, CHIEF JUDGE** |
| and | : |
| HERCULES, INC., | : |
| Defendant-Intervenor. | : |

Plaintiff, Bergerac, N.C. (Bergerac), moves for Judgment Upon An Agency Record pursuant to U.S. CIT R. 56.2, challenging the U.S. Department of Commerce's (Commerce) refusal to exclude certain home market sales as sample sales outside the ordinary course of trade in the final results of Commerce's antidumping administrative review in *Industrial Nitrocellulose From France*, 63 Fed. Reg. 49,085 (Sept. 14, 1998) (final results of antidumping administrative review) (*Final Results*). In making its final determination, Commerce found Bergerac had not met its burden of proof in demonstrating that the sales in question were outside the ordinary course of trade as required by statute. Defendant, United States, and defendant-intervenor, Hercules, Inc., oppose the motion stating the challenged determination is supported by substantial evidence and is otherwise in accordance with law.

*Held*: Plaintiff's motion for Judgment Upon An Agency Record is denied. The Court finds Commerce's *Final Results* are supported by substantial evidence on the record and are otherwise in accordance with law and sustains them in their entirety. This action is dismissed.

Date: June 21, 2000

*Ablondi, Foster, Sobin & Davidow, P.C.* (*James Taylor, Jr.*), Washington, D.C., for plaintiff.

*David W. Ogden*, Acting Assistant Attorney General of the United States; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Lucius B. Lau); *Mark A. Barnett*, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Counsel, for defendant.

**Court No. 98-10-03045**

*Miller Thomson Wickens & Lebow* LLP (*Edward M. Lebow* and *Beverly D. Ross*), Washington, D.C., for defendant-intervenor.

**CARMAN, CHIEF JUDGE:** This matter is before the Court on plaintiff's, Bergerac, N.C. (Bergerac), motion for Judgment Upon An Agency Record pursuant to U.S. CIT R. 56.2. Plaintiff asserts the U.S. Department of Commerce's (Commerce) refusal to exclude certain home market sales as sample sales outside the ordinary course of trade in the final results of Commerce's antidumping administrative review in *Industrial Nitrocellulose From France*, 63 Fed. Reg. 49,085 (Sept. 14, 1998) (final results of antidumping administrative review) (*Final Results*), is not supported by substantial evidence and is not otherwise in accordance with law. Plaintiff requests this Court remand the action to Commerce with instructions to exclude Bergerac's home market sales of priced samples from the margin calculation and to articulate meaningful standards from which a respondent may discern whether its home market sample sales will be regarded as sales in the ordinary course of trade. Defendant, United States, and defendant-intervenor, Hercules, Inc. (Hercules), oppose the motion stating the *Final Results* are supported by substantial evidence and are otherwise in accordance with law.

This Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994). For the reasons which follow, plaintiff's motion for Judgment Upon An Agency record is denied, Commerce's *Final Results* are sustained in their entirety, and this action is dismissed.

On September 25, 1997, Commerce initiated an administrative review of antidumping

duty orders and findings of certain industrial nitrocellulose from, among other countries, France.

*See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 62 Fed. Reg.

50,292 (Sept. 25, 1997).  Bergerac is a producer in France of industrial nitrocellulose, the

merchandise at issue in the review.  In response to Commerce's initial questionnaire requesting

detailed information on U.S. and home market sales, plaintiff claimed it "often sends samples to

customers for approval" and that "[s]ample sales . . . are outside the ordinary course of trade . . . ."

(Bergerac Questionnaire Responses, Plaintiff's Appendix Pursuant to CIT Rule 56.2 (App.),

Public Document (Pub. Doc.) 14, at A-12 and B-12.)

Commerce requested in a supplemental questionnaire information concerning Bergerac's

"zero-value transactions (samples and prototypes)" to determine whether the reported

transactions "were outside the ordinary course of trade."  (Bergerac Supplemental Questionnaire,

App., Pub. Doc. 20, at 17.)  Specifically, Commerce requested Bergerac:

  a)     describe how the orders for these sales were communicated;

  b)     indicate the documents available to demonstrate that these sale[s] are in fact
         samples and prototypes;

  c)     explain whether the customer in question purchased these particular items before
         the date of the claimed sample sale and, if so, indicate how many were purchased;

  d)     contrast the prices <u>and</u> quantities involved in these purchases with normal sales of
         these items, if any, to other customers <u>and</u> subsequent sales to the same customer;

  e)     indicate the ultimate disposition of this merchandise, explain whether title was
         passed to the recipient of the merchandise, and indicate whether the merchandise
         was tested and destroyed during the trial application;

  f)     describe any non-monetary payment and/or consideration made by your customer
         for the transactions.

 (*Id*. (emphasis in original).)  Bergerac responded by providing information regarding both priced

and zero-value transactions including information concerning free samples and priced samples. Bergerac filed its response the same date as the statutory deadline for submissions of unsolicited factual information, January 20, 1998. *See* 19 C.F.R. § 351.301(b)(2) (1998)[1].

In its April 17, 1998, decision memo, Commerce stated it did not consider plaintiff's priced sample sales to be outside the ordinary course of trade and, therefore, such sales were not excluded by Commerce in its margin calculation. Specifically, Commerce stated, "[Bergerac] did not provide adequate evidence that any of these sales were unique or unusual and, therefore, outside the ordinary course of trade." (Analysis Methodology Used to Determine Dumping Margins for Bergerac, N.C., App., Pub. Doc. 31, at 5.)

In its case brief filed June 10, 1998, and at a public hearing held on June 18, 1998, Bergerac attempted to provide additional information concerning its priced samples. Commerce rejected such information, finding that it was untimely because Commerce had not specifically solicited the additional information after January 20, 1998.

On September 14, 1998, Commerce issued its final results stating it disagreed with Bergerac that it should exclude certain home market sales because they were outside the ordinary course of trade. Specifically, regarding priced samples, Commerce stated, "[W]hile it is clear

---

[1] The applicable regulations are those found at 19 C.F.R. Part 351, as Commerce stated, in its papers before the Court, that a request for investigation was filed with Commerce after the effective date of the new regulations as identified in 19 C.F.R. § 351.701 (1998). (Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment on the Agency Record Pursuant to CIT Rule 56.2, at 2 n.1.)

that the invoices for these sales indicated that they were sample sales, such indication is not sufficient to demonstrate that the sale is unique or unusual or otherwise outside the ordinary course of trade." *Final Results*, 63 Fed. Reg. at 49,087. Commerce further stated, "Bergerac's argument that these sales were at a high price to cover the high cost of shipping small packages does not address the Department's 'unique or unusual' standard concerning ordinary course of trade." *Id.* Accordingly, Commerce found Bergerac had not met its burden of proof in demonstrating that the sales in question were outside the ordinary course of trade. *See id.* at 49,087-88. Bergerac timely filed a summons in this action on October 13, 1998.

CONTENTIONS OF THE PARTIES

A.    *Plaintiff*

Plaintiff argues it met its burden of demonstrating that the sales in question were sales of sample merchandise outside the ordinary course of trade. Plaintiff points to the commercial definition of the term "sample" that is defined as a "small quantity" that is "presented for inspection or examination." BLACK'S LAW DICTIONARY 1203 (5th ed. 1979). Plaintiff asserts it provided probative evidence that its priced sample sales were contemporaneously identified as priced samples in normal business records, generally smaller in quantity and higher in price than normal commercial sales, and generally tested and destroyed. Taking the evidence as a whole, Bergerac argues it satisfied its burden of proof that the sales in question were priced sample sales not in the ordinary course of trade.

Plaintiff argues Commerce's reference to certain agency decisions is inapposite because in the cases cited the challenging parties only provided evidence regarding higher prices or

higher profits or smaller quantities in support of their claims that certain sales were outside the ordinary course of trade. *See, e.g., Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Germany*, 61 Fed. Reg. 38,166 (July 23, 1996); *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al.*, 62 Fed. Reg. 54,043, at 54,065-66 (Oct. 17, 1997) (final results of antidumping duty administrative reviews). Here, however, plaintiff contends the sample sales should have been considered outside the ordinary course of trade because their character as samples for testing purposes in non-commercial quantities placed them outside the ordinary course of trade.

Further, plaintiff argues, Commerce's reference to these cases in the *Final Results* demonstrates Commerce failed to consider the totality of the evidence before it and, in particular, overlooked key evidence provided by Bergerac—namely, that the samples were for testing purposes. In the past, Commerce has excluded home market sales of test samples on the grounds that they were outside the ordinary course of trade. *See, e.g., Granular Polytetrafluoroethylene Resin From Japan*, 58 Fed. Reg. 50,343, at 50,345 (Sept. 27, 1993) (final).

Bergerac further contends, in as much as it satisfied its burden of proof, Commerce failed to meet its burden of rebutting the evidence. Bergerac states that Commerce did not point to any inconsistencies or contradictions in the information provided but rather stated that "'Bergerac did not respond as to whether the customer had purchased these particular items previously.'" (Brief in Support of Plaintiff's Motion for Judgment on the Agency Record Pursuant to CIT Rule 56.2, at 18 (Plaintiff's Br.) (quoting *Final Results*, 63 Fed. Reg. at 49,088).) Bergerac argues, however, it did provide such information. According to Bergerac, it stated in its case brief that

"[s]amples are sold to customers." (Bergerac's Case Brief, App., Pub. Doc. 47, at 2 n.1.) Moreover, Bergerac contends, whether the samples were sold to existing customers is irrelevant to whether the sample sales are outside the ordinary course of trade.

Bergerac additionally argues that although Commerce found Bergerac failed to demonstrate the priced sample sales were "unique or unusual," there is no body of case law nor any regulation which defines "unique or unusual" as a separate standard or identifies factors relevant to such a standard.

Bergerac also criticizes Hercules's and defendant's arguments as inadequate. Bergerac argues Hercules's suggestion that Commerce was warranted in presuming the answers to Commerce's questions would not have supported Bergerac's claimed exclusion is unwarranted because Commerce did not apply a "facts available" test in this case. Bergerac also argues defendant's post hoc rationalization that since sample sales are a "'common occurrence,'" they are by definition "'a condition or practice that [is] normal for this particular trade,'" should not be considered by this Court as it is not the rationale stated by the agency in its administrative determination. (Reply Brief in Support of Plaintiff's Motion for Judgment on the Agency Record Pursuant to CIT Rule 56.2, at 8 (quoting Defendant's Memorandum in Opposition to Plaintiff's Motion for Judgment on the Agency Record Pursuant to CIT Rule 56.2, at 28 (Def.'s Br.)).) Further, Bergerac contends the defendant's assertion that Bergerac should be estopped from arguing its priced samples were not sold in commercial quantities is false. Rather, Bergerac argues, the small quantities involved in the priced sample sales were an essential part of its argument in favor of the exclusion of such sales.

Bergerac also contends Commerce improperly denied Bergerac the opportunity to provide additional information concerning the priced sample sales. According to Bergerac, Commerce did not identify alleged deficiencies in Bergerac's questionnaire responses concerning the priced sample sales until after the preliminary determination, and when Bergerac attempted to provide additional information, Commerce refused it as untimely. Bergerac contends, however, if Commerce believed Bergerac's questionnaire responses were deficient, Commerce was required by law to provide Bergerac an opportunity to remedy the alleged deficiency. As Commerce failed to provide such an opportunity, plaintiff asserts, the Court should remand this case to Commerce with instructions to exclude the sample sales.

B.     *Defendant*

Defendant, United States, argues that Commerce's determination that Bergerac's priced sample sales were within the ordinary course of trade is supported by substantial evidence and is otherwise in accordance with law. Initially, defendant argues, in as much as Congress has not identified every instance in which sales are to be considered outside the ordinary course of trade, *see* 19 U.S.C. § 1677(15) (1994), Commerce has broad discretion to establish its own methodology for determining whether sales are outside the ordinary course of trade. Commerce's regulation, 19 C.F.R. § 351.102(b) (1998), articulates Commerce's methodology. Under this methodology, there is a presumption that all sales are within the ordinary course of trade, and the party making the claim otherwise bears the burden of proving the sales are outside the ordinary course of trade.

According to defendant, Bergerac failed to meet its burden of proof that its priced sample

sales were outside the ordinary course of trade. First, defendant argues, Bergerac merely identified the sales in question as "samples" and stated they were sold at a high price. Citing *Koyo Seiko Co., Ltd. v. United States*, 20 CIT 772, 783, 932 F. Supp. 1488, 1498 (1996), defendant argues the mere identification of sales as "samples" is insufficient to demonstrate that the sales in question are outside the ordinary course of trade. Second, defendant argues the mere existence of relatively high sales prices and smaller quantities is insufficient to demonstrate that the sales are outside the ordinary course of trade. Third, defendant claims the statement that the priced sample sales generally were tested and destroyed does not establish the sales in question were tested and destroyed. Fourth, citing *NTN Bearing Corp. of Am. v. United States*, 19 CIT 1165, 1172, 903 F. Supp. 62, 69 (1995), defendant contends the fact that Bergerac filed certifications as to the factual accuracy of its statements does not establish that the sales in question were outside the ordinary course of trade. Finally, defendant contends, Bergerac did not specifically answer Commerce's question whether Bergerac's customers had previously purchased these types of sample sales. According to defendant, these findings show plaintiff failed to meet its burden of proof and provide ample support for the agency's conclusion that the priced sample sales are within the ordinary course of trade.

To the extent plaintiff argues its priced samples should not be used for purposes of calculating normal value because they were not made in "commercial quantities," defendant contends the argument should not be considered by this Court. According to defendant, Bergerac never argued to Commerce that its priced samples were not made in the usual commercial quantities, and to the extent that it does so now, the Court should not address the argument based on Bergerac's failure to exhaust its administrative remedies. *See* 28 U.S.C. § 2637(d) (1994).

Defendant adds Bergerac now concedes that it is a "'common occurrence'" for samples to be sold to existing customers. (Def.'s Br. at 23 (quoting Plaintiff's Br. at 19).) Defendant argues this concession validates Commerce's decision as such a fact makes the sample sales at issue within the normal course of trade under consideration. Defendant also argues Bergerac's reference to the definition of "sample" in BLACK'S LAW DICTIONARY fails to support Bergerac's argument. Specifically, defendant contends while a dictionary definition may be helpful in defining a statutory term, it is not helpful where, as here, the statute contains only illustrative uses of the term, and the merchandise at issue is not on that list.

Defendant also argues Commerce acted within its discretion by not affording Bergerac the opportunity to submit additional factual information after the January 20, 1998, deadline. According to defendant, agency regulations, which have been upheld as reasonable by the courts, state that unsolicited factual information submitted later than 140 days after the last day of the anniversary month is considered untimely. *See* 19 C.F.R. § 351.301. As Bergerac submitted new factual information in its case brief and at the administrative hearing in June 1998, well after the January 20, 1998, deadline, Commerce properly rejected the information.

C.      *Defendant-Intervenor*

Defendant-Intervenor, Hercules, argues sample sales are considered to be within the ordinary course of trade unless the party asserting that the sales are outside the ordinary course of trade proves otherwise. Here, according to defendant-intervenor, plaintiff failed to meet its burden of proof as it did not answer Commerce's specific request for information concerning a comparison of prices, quantities, and customers for the products concerned in its questionnaire

responses. Moreover, defendant-intervenor contends, plaintiff's argument that its one-kilogram sale was "almost six times higher than the normal market price" is, without more, insufficient to prove the sale was outside the ordinary course of trade. Defendant-intervenor additionally asserts plaintiff's identifying sales as samples is equally insufficient, without more, to prove the sales were outside the ordinary course of trade. Further, defendant-intervenor argues certifying to the factual accuracy of a submission does not prove a sale is a sample sale outside the ordinary course of trade. In light of the lack of information provided, defendant-intervenor contends Commerce correctly considered the priced sample sales to be in the ordinary course of trade and included them in the margin calculation. Defendant-intervenor additionally contends Commerce properly excluded information provided by plaintiff in its case brief and at the hearing in June 1998 as untimely as it was submitted after the statutory deadline. Thus, defendant-intervenor argues, plaintiff's motion should be denied and Commerce's determination affirmed.

STANDARD OF REVIEW

This Court will sustain a final determination by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951), *quoted in Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). For the purposes of judicial review, the evidence is limited to the administrative record. *See Toyota Motor Sales, U.S.A., Inc. v. United States*, 15 F. Supp. 2d 872, 877 (CIT 1998). Whether Commerce properly excluded plaintiff's information submitted after January 20, 1998, depends on "whether Commerce complied with the statute defining the administrative record for review."

*Kerr-McGee Chem. Corp. v. United States*, 21 CIT 11, 18, 955 F. Supp. 1466, 1471 (1997).

In determining the lawfulness of an agency's construction of a statute, we are guided by the Supreme Court's decision in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984). Under *Chevron*, the first question is "whether Congress has directly spoken to the precise question at issue." *Id*. at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id*. at 842-43.

If, however, the statute is "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843 (footnote omitted). Thus, the second element of *Chevron* directs the Court to consider the reasonableness of an agency's determination. To survive judicial scrutiny, "an agency's construction need not be the *only* reasonable interpretation or even the *most* reasonable interpretation. Rather, a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another." *Koyo Seiko Co., Ltd. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (citation omitted) (emphasis in original).

DISCUSSION

A.      *Supplemental Information*

Plaintiff argues Commerce should have accepted supplemental information concerning priced sample sales submitted after the statutory deadline for new information as Commerce did not identify alleged deficiencies in plaintiff's questionnaire responses until after the preliminary

determination.  Plaintiff's argument lacks merit.  Factual information for Commerce's

consideration for the final results of an administrative review "is due no later than . . . 140 days

after the last day of the anniversary month . . . ." 19 C.F.R. § 351.301(b)(2).  Previously, this

Court has sustained Commerce's rejection of new factual information submitted untimely

pursuant to its regulations.  *See, e.g., Mukand, Ltd. v. United States*, Court No. 98-04-00925,

1999 Ct. Int'l Trade LEXIS 34, *12-15 (CIT April 9, 1999); *NSK Ltd. v. United States*, 16 CIT

745, 749, 798 F. Supp. 721, 725 (1992).  As the supplemental information was offered to

Commerce in June 1998, after the January 20, 1998[2], deadline for new factual information, this

Court finds Commerce's rejection of the supplemental information as untimely was reasonable.


        To the extent plaintiff argues Commerce had a separate obligation to provide plaintiff an

opportunity to remedy the alleged deficiencies, plaintiff's argument must also fail.  Section

1677m(d), defining an agency's obligation for providing respondents an opportunity to remedy

alleged deficiencies in information submitted to it, states, in pertinent part[3]:

    (d) Deficient submissions

        If the administering authority . . . determines that a response to a request for
    information under this subtitle does not comply with the request, the administering
    authority . . . shall promptly inform the person submitting the response of the nature of

---

[2]  The anniversary month for this administrative review was in August 1997.  *See*
*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 62 Fed. Reg. 50,292
(Sept. 25, 1997).  January 18, 1998, was the 140th day from the last day in the anniversary month,
August 31, 1997.  As January 18 fell on a Sunday and as the following day was a national
holiday, the deadline for submitting new factual information for the final results of the
administrative review at issue was on January 20, 1998.

[3]  Although plaintiff does not identify the statute under which Commerce would be
required to provide plaintiff an opportunity to remedy or explain deficiencies in its submissions,
it appears plaintiff is referring to 19 U.S.C. § 1677m(d) (1994).

the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle.

19 U.S.C. § 1677m(d) (1994).  In the case at bar, Commerce provided plaintiff an opportunity to clarify its contention that the sample sales should be excluded from the margin calculation in the supplemental questionnaire issued in December 1997.  Thus, to the extent Commerce was statutorily obligated to provide plaintiff an opportunity to remedy or explain the alleged deficiencies, Commerce fulfilled its obligation.  Therefore, the Court finds Commerce properly rejected the June 1998 submissions as untimely.[4]

B.       *Ordinary Course of Trade*

The antidumping duty laws of the United States allow Commerce to issue antidumping duty orders upon imported merchandise which is being, or is likely to be, sold in the United

---

[4] Plaintiff cites *Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565 (Fed. Cir. 1990), and *Ta Chen Stainless Steel Pipe, Ltd. v. United States*, Court No. 97-08-01344, 1999 Ct. Int'l Trade LEXIS 110 (CIT Oct. 28, 1999), to support its argument.  These cases, however, are distinguishable from the case at bar as they concern an agency's ability to use adverse facts. Additionally, although the *Ta Chen* court found an agency's use of a general questionnaire was insufficient to satisfy the agency's "statutory obligation to provide respondents with a chance to remedy deficient submissions," *Ta Chen*, 1999 Ct. Int'l Trade LEXIS 110, *41, its conclusion was based on the fact that the agency never specifically requested the information against which it applied adverse facts.  As stated above, Commerce in the case at bar specifically requested information concerning plaintiff's sample sales in the supplemental questionnaire issued in December 1997.  Although Commerce's framing of the question is less than a model of clarity, *e.g.*, asking for information concerning "zero-value transactions (samples and prototypes)," Commerce's specific questions indicated it was interested in a broader description of sample sales than those without consideration, *e.g.*, Commerce asked plaintiff to describe any "consideration made by your customer for the transactions." (Bergerac's Supplemental Questionnaire, Plaintiff's Appendix Pursuant to CIT Rule 56.2 (App.), Public Document (Pub. Doc.) 20, at 17.)  Also, as plaintiff submitted information regarding zero-value and priced sample sales, the Court finds plaintiff sufficiently had an opportunity to explain the alleged deficiencies regarding the sample sales in question.  Plaintiff's reference to these cases is unpersuasive.

States at less than fair value. *See* 19 U.S.C. § 1673 (1994). In determining whether subject

merchandise is being, or is likely to be, sold at less than fair value in an antidumping duty

determination, a comparison is made between the price of the merchandise in the United States

("export price" or "constructed export price") and its price in a foreign market ("normal value").[5]

*See Huffy Corp. v. United States*, 10 CIT 214, 215, 632 F. Supp. 50, 52 (1986). The "normal

value" is the price at which the foreign like product is first "sold" for consumption in the

exporting country "in the usual commercial quantities and in the ordinary course of trade." 19

U.S.C. § 1677b(a)(1)(B)(i) (West Supp. 1999).[6] Thus, the price of the merchandise is included in

---

[5] In 1994, the Uruguay Round Agreements Act (URAA) substituted the term "export price" for the term "U.S. price" and the term "normal value" for the term "foreign market value." *See* URAA, PUB. L. NO. 103-465, §§ 233(a)(1), (2)(A), 108 Stat. 4809, 4878 (Dec. 8, 1994).

[6] The relevant section of the statute pertaining to the calculation of "normal value" states:

(a) Determination

In determining under this subtitle whether subject merchandise is being, or is likely to be, sold at less than fair value, a fair comparison shall be made between the export price or constructed export price and normal value. In order to achieve a fair comparison with the export price or constructed export price, normal value shall be determined as follows:

(1) Determination of normal value

(A) In general

The normal value of the subject merchandise shall be the price described in subparagraph (B) . . .

(B) Price

The price referred to in subparagraph (A) is—

(i) the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual

the margin calculation if, among other things, the merchandise is "sold" in the "ordinary course

of trade."  If it is not "sold" or not sold in the "ordinary course of trade," the merchandise is

excluded from the margin calculation.

The Court of Appeals for the Federal Circuit has held that the term "sold" requires (1) a

transfer of ownership to an unrelated party; and (2) consideration.  *See NSK Ltd. v. United States*,

115 F.3d 965, 975 (Fed. Cir. 1997).  The parties do not dispute that there was consideration for

priced sample sales at issue here, and there was a transfer of ownership to unrelated parties.

Therefore, the priced sample sales at issue are considered "sold" for the purposes of the "normal

value" calculation under section 1677b(a)(1)(B)(i).

The phrase "ordinary course of trade" is defined by statute as "the conditions and

practices which, for a reasonable time prior to the exportation of the subject merchandise, have

been normal in the trade under consideration with respect to merchandise of the same class or

kind."  19 U.S.C. § 1677(15).[7]  What is to be considered "outside the ordinary course of trade"

includes, "*among others*, . . . (A) Sales disregarded under section 1677b(b)(1) [below cost sales]

of this title; (B) Transactions disregarded under section 1677b(f)(2) [transactions between

affiliated parties] of this title."  19 U.S.C. § 1677(15) (emphasis added).

---

commercial quantities and in the ordinary course of trade
and, to the extent practicable, at the same level of trade as
the export price or constructed export price . . . .

19 U.S.C. § 1677b(a)(1)(B)(i) (West Supp. 1999).

[7]  Commerce's regulations define "ordinary course of trade" as having "the same meaning
as in section 771(15) of the Act [19 U.S.C. § 1677(15)]." 19 C.F.R. § 351.102(b) (1998).

Determining whether a sale or transaction is outside the ordinary course of trade is a

question of fact. In making this determination, Commerce considers not just "one factor taken in

isolation but rather . . . all the circumstances particular to the sales in question." *Murata Mfg.*

*Co., Ltd. v. United States*, 17 CIT 259, 264, 820 F. Supp. 603, 607 (1993) (citation omitted).

Commerce's methodology for making this determination is codified in section 351.102(b) of

Commerce's regulations. *See* 19 C.F.R. § 351.102(b)[8]; *see also Antifriction Bearings (Other*

*Than Tapered Roller Bearings) and Parts Thereof From France, et al.*, 64 Fed. Reg. 35,590, at

35,620 (July 1, 1999) (final results of antidumping duty administrative review).


Bergerac criticizes Commerce's methodology for determining whether certain sales or

transactions are outside the ordinary course of trade as being void of any meaningful standards

and failing to identify information that is necessary for Commerce to make its determination.

Consequently, Bergerac argues, it is inappropriate for Commerce to claim Bergerac has not met

its burden of proof that the sales in question were outside the ordinary course of trade.

Bergerac's argument lacks merit. Plaintiff's criticism appears essentially to involve a question of

---

[8] Section 351.102(b) of the regulation states, in part, "The Secretary may consider sales
or transactions to be outside the ordinary course of trade if the Secretary determines, based on an
evaluation of all of the circumstances particular to the sales in question, that such sales or
transactions have characteristics that are extraordinary for the market in question." 19 C.F.R. §
351.102(b). Examples that might be considered outside the ordinary course of trade include: (1)
off-quality merchandise; (2) merchandise produced according to unusual product specifications;
(3) merchandise sold at aberrational prices or with abnormally high profits; (4) merchandise sold
pursuant to unusual terms of sale; or (5) merchandise sold to an affiliated party not at an arm's
length transaction. *See* 19 C.F.R. § 351.102(b). The Statement of Administrative Action
accompanying the URAA contains similar language and identifies similar types of transactions
Commerce may consider to be outside the ordinary course of trade, including (1) sales
disregarded as being below-cost; and (2) transactions between affiliated persons. *See* H.R. DOC.
NO. 103-316, vol. 1, at 834 (1994), reprinted in 1994 U.S.C.C.A.N. 3773, 4171.

statutory interpretation as Commerce's methodology, codified at 19 C.F.R. § 351.102(b),

effectively interprets the statutory phrase "outside the ordinary course of trade." 19 U.S.C. §

1677(15). In resolving questions of statutory interpretation, *Chevron* requires this Court first to

determine whether the statute is clear on its face.[9] If the language of the statute is clear, then this

Court must defer to Congressional intent. *See Chevron*, 467 U.S. at 842-43. If the statute is

unclear, however, then the question for the Court is whether the agency's answer is based on a

permissible construction of the statute. *See id.* at 843; *see also Corning Glass Works v. United*

*States*, 799 F.2d 1559, 1565 (Fed. Cir. 1986) (finding the agency's definitions must be

"*reasonable* in light of the language, policies and legislative history of the statute").

Here, the statutory provision defining what is considered outside the ordinary course of

trade is unclear. While the statute specifically defines "ordinary course of trade," it provides

little assistance in determining what is outside the scope of that definition. The statute merely

identifies a non-exhaustive list of situations in which sales or transactions are to be considered

outside the "ordinary course of trade." This Court finds the statute is ambiguous as to what

constitutes a sale outside the ordinary course of trade.

---

[9] The Court notes the recent Supreme Court decision in *Christensen v. Harris Co.*, 120 S. Ct. 1655 (2000), does not apply. In *Christensen*, the Supreme Court held that *Chevron* deference does not apply to an "opinion letter" issued by the Acting Administrator of the United States Department of Labor's Wage and Hour Division (Labor) because Labor's interpretation of the statute at issue was "not one arrived at after, for example, a formal adjudication or notice-and-comment rulemaking." *Id.* at 1662 (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984)). Unlike *Christensen*, this case examines an agency's regulation construing an ambiguous statute. In accordance with the Administrative Procedures Act, 5 U.S.C. § 553 (1994), the regulation underwent a notice-and-comment process. *See* 5 U.S.C. § 553(b) & (c); *see also Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296 (May 19, 1997) (revising regulations on antidumping and countervailing duty proceedings). Consequently, *Chevron* deference applies.

What Congress intended to exclude from the "ordinary course of trade" is also not immediately clear from the statute's legislative history, amended by the Uruguay Round Agreements Act (URAA) in 1994. In the Statement of Administrative Action accompanying the URAA, Congress stated that in addition to the specific types of transactions to be considered outside the ordinary course of trade, "Commerce may consider other types of sales or transactions to be outside the ordinary course of trade when such sales or transactions have characteristics that are not ordinary as compared to sales or transactions generally made in the same market." H.R. Doc. No. 103-826, vol. 1, at 834 (1994), reprinted in 1994 U.S.C.C.A.N. 3773, 4171. Congress also stated that as the statute does not provide an exhaustive list of situations which qualify as being outside the ordinary course of trade, "the Administration intends that Commerce will interpret section 771(15) [19 U.S.C. § 1677(15)] in a manner which will avoid basing normal value on sales which are extraordinary for the market in question." *Id*. This Court finds the legislative history is also ambiguous as to what constitutes a sale outside the ordinary course of trade.

Because neither the statutory language nor the legislative history explicitly establishes what is considered to be outside the "ordinary course of trade," the Court assesses the agency's interpretation of the provision as codified by the regulation to determine whether the agency's interpretation is reasonable and in accordance with the legislative purpose. *See Chevron*, 467 U.S. at 843. In determining whether Commerce's interpretation is reasonable, the Court considers, among other factors, the express terms of the provisions at issue, the objectives of those provisions, and the objective of the antidumping scheme as a whole. *See, e.g., Mitsubishi Heavy Indus., Ltd. v. United States*, 15 F. Supp. 2d 807, 813 (CIT 1998). This Court has stated

that the purpose of the ordinary course of trade provision is "to prevent dumping margins from being based on sales which are not representative" of the home market. *See Monsanto Co. v. United States*, 12 CIT 937, 940, 698 F. Supp. 275, 278 (1988).

As stated above, the agency's methodology for deciding when sales are outside the "ordinary course of trade" has been to examine the totality of the circumstances surrounding the sale or transaction in question to determine whether the sale or transaction is extraordinary. Commerce's regulation specifically states, "sales or transactions [may be considered] outside the ordinary course of trade if . . . , based on an evaluation of all of the circumstances particular to the sales in question, [] such sales or transactions have characteristics that are extraordinary for the market in question." 19 C.F.R. § 351.102(b). Commerce's methodology allows it, on a case-by-case basis, to examine all conditions and practices which may be considered ordinary in the trade under consideration and to determine which sales or transactions are, therefore, outside the "ordinary course of trade." While such a methodology gives Commerce wide discretion in deciding under what circumstances sales or transactions are outside the ordinary course of trade, circumstances which will, by necessity, differ in each case, this Court finds, in light of the statute's legislative purpose, Commerce's interpretation of the statute reasonable.[10]

---

[10] Bergerac also argues Commerce failed to articulate adequately a standard for determining whether a sale or transaction is "unique or unusual" as applied in the case at bar. Bergerac's argument lacks merit. While Commerce used the words "unique or unusual" in its "ordinary course of trade" analysis at issue here, *see Industrial Nitrocellulose From France*, 63 Fed. Reg. 49,085, at 49,087 (Sept. 14, 1998) (final results of antidumping administrative review), the Court finds, upon review of the determinations in which Commerce has used "unique" or "unusual," the words do not constitute a separate methodology but rather represent circumstances Commerce considers in applying its totality of the circumstances methodology to determine whether the sales or transactions in question are outside the ordinary course of trade. *See, e.g., Polyvinyl Alcohol From Taiwan*, 61 Fed. Reg. 14,064, at 14,068 (March 29, 1996) (final

Bergerac, in its papers before the Court, principally objects to Commerce's inclusion of certain priced sample sales in the margin calculation that Bergerac claims were made outside the ordinary course of trade.[11] To justify its claimed exclusion, Bergerac argues it provided probative evidence that its priced sample sales were sample sales outside the ordinary course of trade. Specifically, Bergerac asserts it provided evidence that the priced sample sales were contemporaneously identified as priced samples in the normal business record, sold in small quantities, sold at high prices, generally tested and destroyed, and Bergerac provided certifications of factual accuracy regarding this information. Bergerac also contends that Commerce, in the *Final Results*, overlooked key elements of the evidence provided by Bergerac, such as the fact that the samples were provided for testing purposes, as Commerce neither mentioned nor specifically cited cases dealing with samples which have been tested and destroyed. Bergerac maintains that the inclusion of these priced sample sales in calculating

---

determination of sales at less than fair value) (finding no evidence existed that the sales in question were "unusual or extraordinary" for the market and therefore the sales were not outside the ordinary course of trade); *Gray Portland Cement and Clinker From Mexico*, 62 Fed. Reg. 17,148, at 17,154 (April 9, 1997) (final results of antidumping duty administrative review) (stating failure to exclude certain sales from the normal value calculation would violate the intent of the Statement of Administrative Action because normal value would be based on sales which were "unusual and unrepresentative"). The Court notes the term "unusual" is oft repeated as a qualifying adjective describing examples of sales that the Secretary might consider as being outside the ordinary course of trade under Commerce's definition of "ordinary course of trade" in its regulations. *See* 19 C.F.R. § 351.102(b) ("Examples of sales that the Secretary might consider as being outside the ordinary course of trade are sales or transactions involving . . . unusual product specifications . . . [or] . . . unusual terms of sale . . . ."). Moreover, the Court finds the words "unique" and "unusual" are synonymous with the term "extraordinary," *see* WEST'S LEGAL THESAURUS/DICTIONARY 773, 779 (1985) (listing "extraordinary" as a synonym for both "unique" and "unusual"), expressed as part of the totality of the circumstances methodology now codified in Commerce's regulation, 19 C.F.R. § 351.102(b), herein found to be a reasonable interpretation of the statute. Thus, Begerac's argument fails as a matter of law.

[11] The sales contested on appeal are limited to priced sample sales.

foreign market value erroneously increased its total potential dumping duties. Bergerac seeks

their exclusion and recalculation of its dumping margins.


In the *Final Results*, Commerce explained its reasons for including the sales in question

as home market sales in the ordinary course of trade:

> Regarding priced samples, while it is clear that the invoices for these sales indicated that
> they were sample sales, such indication is not sufficient to demonstrate that the sale is
> unique or unusual or otherwise outside the ordinary course of trade. *See* Antifriction
> Bearings (Other Than Tapered Roller Bearings[)] and Parts Thereof from France,
> Germany, Italy, Japan, Singapore, and the United Kingdom, Final Results of
> Antidumping Duty Administrative Reviews, 62 FR 2081 (January 15, 1997) (where,
> although we verified that certain sales were designated as samples in a respondent's
> records, we determined this was insufficient to find them outside the ordinary course of
> trade since such evidence "merely proves that respondent identified sales recorded as
> samples in its own records"). Such evidence does not indicate that the sales were made
> outside the ordinary course of trade for purposes of calculating normal value in this
> review. Bergerac's argument that these sales were at a high price to cover the high cost
> of shipping small packages does not address the Department's "unique or unusual"
> standard concerning ordinary course of trade. *See* Large Newspaper Printing Presses and
> Components Thereof, Whether Assembled or Unassembled From Germany (61 FR
> 38166, July 23, 1996) as discussed in Antifriction Bearings (Other Than Tapered Roller
> Bearings) and Parts Thereof from France, et. al.; Final Results of Antidumping Duty
> Administrative Reviews (62 FR 54043, at 54065-54066, October 17, 1997).
>
> . . . .
>
> Regarding both priced samples and trial transactions, Bergerac failed to provide
> certain information which we requested in a supplemental questionnaire specifically in
> order to determine whether these transactions were outside the ordinary course of trade.
> For example, regarding both types of sales at issue, Bergerac did not respond as to
> whether the customer had purchased these particular items previously. For these reasons,
> the record is incomplete as to whether sales of these products were made to these
> customers prior to the dates of the claimed sample and trial transactions and we have
> retained them for use in our calculation of normal value.

*Final Results*, 63 Fed. Reg. at 49,087-88.


This Court has stated that Commerce cannot exclude sales allegedly outside the ordinary

course of trade from a "normal value" calculation unless there is a complete explanation of the facts which establish the extraordinary circumstances in which the particular sales are outside the ordinary course of trade. *See, e.g., NTN Bearing Corp. of Am. v. United States*, 19 CIT 1221, 1229, 905 F. Supp. 1083, 1091 (1995). As stated previously, in determining whether certain home market sales are outside the ordinary course of trade, Commerce considers not just one factor in isolation but all the circumstances particular to the sales in question. *See CEMEX, S.A. v. United States*, 19 CIT 587, 589 (1995) (citing *Murata*, 820 F. Supp. at 607 (quoting *Certain Welded Carbon Steel Standard Pipes and Tubes from India*, 56 Fed. Reg. 64,753, at 64,755 (1991))); *see also* 19 C.F.R. § 351.102(b). Moreover, an analysis of these factors should be guided by the purpose of the ordinary course of trade provision which is to prevent dumping margins from being based on sales which are not representative of the home market. *Monsanto*, 698 F. Supp. at 278. Factors Commerce has considered in the past, which this Court has upheld, include, among others, home market demand, volume of home market sales, duration of production, profit margin, and purpose. *See, e.g., CEMEX,* 19 CIT at 589-93. In sum, "ordinary course of trade is determined on a case-by-case basis by examining all of the relevant facts and circumstances." *Id.* at 593. The task, then, is to discern whether Commerce's determination was supported by substantial evidence.

The plaintiff bears the burden of demonstrating the sales in question that Commerce included in its calculations were outside the ordinary course of trade. *See, e.g., Koyo Seiko*, 932 F. Supp. at 1497; *see also NTN Bearing*, 903 F. Supp. at 68-69.

This Court is persuaded that substantial evidence supports Commerce's determination

that Bergerac failed to meet its burden of proof that the alleged sample sales were outside the

ordinary course of trade. In *NTN Bearing Corp. of Am. v. United States*, 20 CIT 508, 924 F.

Supp. 200 (1996), the Court upheld Commerce's ruling that sample sales identified as sample or

prototype sales alone does not support the sales classification as outside the ordinary course of

trade for the purposes of antidumping calculations. *See id.* at 207. Similarly here, evidence that

the sales were marked as sample sales is insufficient to support Bergerac's claim. The Court has

also affirmed Commerce's refusal to exclude "infrequent sales of small quantities of certain

models or sales of models at a high price to only a few customers" from the ordinary course of

trade. *See id.* (quoting *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished,*

*From Japan, et al.*, 58 Fed. Reg. 64,720, at 64,732 (final results antidumping duty administrative

review)). Thus, sales, like those at issue here, sold in small quantities[12] and at high prices are

insufficient to establish that they are outside the ordinary course of trade.

Additionally, Bergerac's argument that Commerce erred because it overlooked and failed

to articulate in the *Final Results* key elements of the evidence provided by Bergerac, such as the

fact that the samples were generally tested and destroyed, is without merit. Although an

---

[12] Defendant contends Bergerac failed to argue to Commerce that its priced sample sales were not made in the usual commercial quantity, and therefore, to the extent it does so now, the argument should not be considered by this Court. Plaintiff rebuts that the Court should consider this argument as small quantities involved in the priced samples were an essential part of its argument before Commerce. Although it is unclear to the Court whether Bergerac made the specific argument that the sample sales in question were not of the "usual commercial quantity," Bergerac stated in its response to Commerce's supplemental questionnaire that "[s]amples that are sold are purchased at prices that cover the high cost of handling small shipments." (Bergerac Supplemental Questionnaire, App., Pub. Doc. 20, at 18.) To the extent plaintiff's argument suggests the sales in question were shipped in small quantities, the Court will consider Bergerac's argument as being properly before it.

administrative agency must generally explain the reasons for its decision in order for the reviewing court to ascertain the path of reasoning which led to the final outcome, *see Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974); *see also Asociacion Colombiana de Exportadores v. United States*, 12 CIT 1174, 1177, 704 F. Supp. 1068, 1071 (1988), a court may "'uphold [an agency's] decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987) (quoting *Bowman Transp.*, 419 U.S. at 286).

In this case, while Commerce's reasoning may not be a model of clarity, its decision is obvious in light of the determination as a whole. Bergerac does not identify, nor can the Court find, any evidence supporting Bergerac's contention that the sample sales in question actually were tested and destroyed. Bergerac merely states that the samples of industrial nitrocellulose are outside the ordinary course of trade because they "generally" are "tested and destroyed." (Bergerac Supplemental Questionnaire, App., Pub. Doc. 20, at 18.) Bergerac does not demonstrate that the sample sales in question in fact were tested and destroyed. *See, e.g., Koyo Seiko*, 932 F. Supp. at 1498 (denying consideration of plaintiff's claim that samples were negotiated separately from normal sales where record did not demonstrate, more than through an announcement, that prices for plaintiff's samples were negotiated separately from normal sales). Without more, this factor is unpersuasive. Here, Commerce's path may be reasonably discerned; it included the sample sales because Bergerac failed to prove the samples were not sold in the ordinary course of trade. Consequently, a remand for further explanation is not necessary.

Additionally, Bergerac's argument that it filed certifications of factual accuracy with its

submissions does not establish its sales were outside the ordinary course of trade. *See NTN Bearing*, 903 F. Supp. at 68-69 (stating a certification requirement does not displace substantive burdens of proof which remain with the party who has access to the information).

Finally, by not responding to Commerce's question whether Bergerac's customers had previously purchased the priced samples in question, Bergerac prevented Commerce from having sufficient facts necessary to make its determination. Commerce's decision to require additional evidence to demonstrate that the sales were outside the ordinary course of trade was consistent with the statutory scheme and was a reasonable construction of the provision at issue. *See Koenig & Bauer-Albert AG v. United States*, 15 F. Supp. 2d. 834, 850 (CIT 1998).

As Bergerac inadequately substantiated its claim, Commerce properly declined to exclude from the "normal value" calculation certain sales identified by Bergerac as sample sales made outside the ordinary course of trade. The Court sustains Commerce's decision as supported by substantial evidence and in accordance with law.

CONCLUSION

For the reasons stated above, Bergerac's motion for Judgment Upon An Agency Record is denied in all respects, and the *Final Results* are affirmed. This case is hereby dismissed.

_____
Gregory W. Carman, Chief Judge

Dated: June 21, 2000
      New York, New York